ROBERT H. JONES ET AL. *v.* WILLIAM R. HARRIS

[No. 720, September Term, 1976.]

*Decided April 11, 1977.*

The cause was argued before MENCHINE, LOWE and MASON, JJ.

*Gerard P. Uehlinger,* with whom were *Joseph G. Finnerty, Jr., Edward S. Digges, Jr., Francis B. Burch, Jr., Frazer F. Hilder* and *Piper & Marbury* on the brief, for appellants.

*Paul A. Gibbons,* with whom were *Harry Fox* and *Fine & Klauber, P.A.* on the brief, for appellee.

MENCHINE, J., delivered the opinion of the Court.

William R. Harris (Harris) on January 7, 1976, filed a declaration claiming damages against Robert H. Jones

(Jones) and General Motors Corporation (General Motors) for intentional infliction of emotional distress on June 2, 1975. An amended declaration subsequently filed alleged that the intentional infliction of emotional distress had been committed several months prior and subsequent to June 2, 1975.[1]

The case was submitted to a jury in the Superior Court of Baltimore City and ultimately resulted in a verdict in favor of Harris against both Jones and General Motors for $3,500.00 compensatory damages and for $15,000.00 punitive damages.[2]

Jones and General Motors present the following questions on appeal:

"1. Did the trial court err by not granting Appellants' motion for directed verdict, because the evidence was insufficient to support a cause of action for intentional infliction of emotional distress?

2. Did the trial court err by not granting General Motors' motion for a directed verdict, because the evidence was insufficient to establish that the alleged conduct of Jones was within the scope of his employment or ratified by General Motors Corporation?

3. Did the trial court err by not granting Appellant's motion to arrest judgment in these circumstances, because of the irregularity in the rendition and receipt of the jury's verdicts?

4. Did the trial court err by admitting Appellee's wife's testimony, because it was improper and prejudicial in these circumstances?"

1. The declarations included claims for alleged slander but such claims were rejected in the course of trial by the grant of motions for directed verdict in favor of the defendants from which no appeal was taken by Harris.

2. The jury originally rendered a verdict for $2,000.00 compensatory damages against the defendant Jones and for $15,000.00 punitive damages against the defendant General Motors, but was ordered to return to the jury room for further deliberation. The jury thereafter returned the verdict described in the text of this opinion.

Basic to our consideration of the questions presented is the issue whether Maryland will recognize as a valid cause of action the tort of intentional infliction of emotional distress.

The issue is one of first impression in Maryland but has arisen in many other jurisdictions. A majority of the States now favor its recognition as a separate tort after earlier general repudiation of claims for emotional distress except as a parasitic element of damage accompanying a recognized tort.

Nowhere is this changing perspective more apparent than in the writings of the American Law Institute upon the subject.

1 Restatement of Torts, Ch. 2, § 46 (1934) rejected the separate tort in these unequivocal terms:

> "TOPIC 5. The Interest In Freedom From Emotional Distress.
>
> § 46. Conduct Intended To Cause Emotional Distress Only.
>
> Except as stated in §§ 21 to 34 and § 48,[3] conduct which is intended or which though not so intended is likely to cause only a mental or emotional disturbance to another does not subject the actor to liability
>
> (a) for emotional distress resulting therefrom, or
>
> (b) for bodily harm unexpectedly resulting from such disturbance."

In the 1948 Supplement the diametrically opposite position was taken by the Institute, the following rule being declared:

> "TOPIC 5. THE INTEREST IN FREEDOM FROM EMOTIONAL DISTRESS
>
> § 46. CONDUCT INTENDED TO CAUSE EMOTIONAL DISTRESS ONLY.
>
> One who, without a privilege to do so, intentionally causes severe emotional distress to another is liable

---

3. Immaterial to the subject inquiry.

(a) for such emotional distress, and

(b) for bodily harm resulting from it."

1 Restatement of Torts 2d, Ch. 2, Emotional Distress, Topic 5, § 46 (1965) retreated from its 1948 position, therein stating the rule as follows:

## "TOPIC 5. THE INTEREST IN FREEDOM FROM EMOTIONAL DISTRESS

§ 46. *Outrageous* Conduct Causing Severe Emotional Distress

(1) One who by *extreme and outrageous conduct* intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.

(2) Where such conduct is directed at a third person, the actor is subject to liability if he intentionally or recklessly causes severe emotional distress

(a) to a member of such person's immediate family who is present at the time, whether or not such distress results in bodily harm, or

(b) to any other person who is present at the time, if such distress results in bodily harm." (Emphasis added to indicate substantive change.)

General recognition of the independent tort was asserted in 64 A.L.R.2d 100,[4] wherein it was said at 119-20:

"§ 8. Intentional or reckless act.

... in many of the early cases statements recognizing generally that there can be no recovery for emotional distress alone can be characterized as dicta, and there now appears to be a definite trend toward the recognition of a right to recover for a

---

**4.** Annotation: Right to recover for emotional disturbance or its physical consequences, in the absence of impact or other actionable wrong.

> severe disturbance of mental or emotional tranquillity resulting from an unprivileged act of defendant reasonably calculated to cause grave mental distress to plaintiff and committed intentionally or recklessly."

Prosser, *Law of Torts*, Ch. 2 § 12 at 56 (4th Ed. HB, 1971) gives recognition to the independent tort and thus defines its boundaries:

> "So far as it is possible to generalize from the cases, the rule which seems to have emerged is that there is liability for conduct exceeding all bounds usually tolerated by decent society, of a nature which is especially calculated to cause, and does cause, mental distress of a very serious kind." [5]

We have stated that the question whether the new tort is viable in Maryland is one of first impression. There are, however, clear guides to indicate a trend toward recognition of the emerging tort.

In their discourses upon and acceptance of this new tort, two distinguished authors, Prosser [6] and Magruder [7] have cited *Great Atl. & Pacific Tea Co. v. Roch,* 160 Md. 189, 153 A. 22 (1931), as an early precursor to recognition of intentional infliction of emotional distress as a separate tort.

In *Roch,* a jury's verdict for the plaintiff was sustained when she became a "nervous wreck" following the opening of a package containing a dead rat instead of the loaf of bread she had ordered. It is true that the decision of the Court of Appeals was grounded upon the explanation that the

---

**5.** Perhaps the earliest forerunner of the tort was Nickerson v. Hodges, 84 So. 37 (S. Ct. La. 1920) widely known as the "pot of gold" case. The victim of a practical joke obtained damages for emotional distress resulting from the planting of an old copper kettle in an area where plaintiff was digging for "buried treasure" believed by family tradition to have been hidden by an ancestor.

**6.** Prosser, *Law of Torts,* Ch. 2, Infliction of Mental Distress, § 12, footnote 86.

**7.** Calvert Magruder: Mental Disturbance in Tort, 49 Harv. L. Rev. 1033, 1046, footnote 56 (1936), in the course of a scholarly article documenting the emergence of legal recognition of a new tort.

evidence would permit a conclusion by the jury that the agent of the defendant "had carelessly and negligently performed his duty in substituting by mistake the dead rat for the loaf of bread," 160 Md. at 192, 153 A. at 23, thereby tying "emotional distress," as a parasitic element, to an action on the case for negligence. Nonetheless, the attached string was quite lightly tied, so that *Roch* does indeed "pint the people to the goal an' in the traces lead 'em." [8]

*See also Mahnke v. Moore*, 197 Md. 61, 77 A. 2d 923 (1951), wherein damages were allowed for nervous shock without substantial physical impact when a young child was required by her father to witness her mother's murder and his own suicide. There were in that case also, lightly tied bonds to another tort or torts.

We are persuaded that the new tort, in a proper case, is viable in this State.

### The Subject Case as to General Motors

That the motion for directed verdict as to General Motors was improperly denied is very clear. There is not a scintilla of evidence that any conduct of defendant Jones against the plaintiff Harris was within the scope of Jones' real or apparent authority. Neither does the record show the slightest later ratification of Jones' actions.

The record shows that Harris filed two grievances against Jones, relative to the latter's alleged harassment of Harris.

The first (P. Ex. 1A) was filed on June 20, 1975, and read as follows:

> "Protest Foreman R. Jones mimicking me and attempting to provoke me. This conduct is unbecoming a member of supervision and I demand higher supervision instruct R. Jones to conduct himself properly at all times in the future."

That exhibit contained a notation of the following disposition: "The supervisor will conduct himself properly at

---

8. James Russell Lowell, *The Bigelow Papers.*

all times." This exhibit showed upon its face that the grievance was satisfactorily settled on July 31, 1975.

The second (P. Ex. 1C) was filed on August 28, 1975, and read as follows:

"Protest Foreman R. Jones continuously attempting to humiliate me. This member of supervision enters my work area and tells me not to get nervous and walks away. I demand management direct Foreman Jones to conduct himself properly at all times."

That exhibit contained a notation of the following disposition: "Supervisors will conduct themselves in a manner becoming to supervision. However, this employee was not under the supervision of Foreman Jones when this grievance was written." This exhibit showed upon its face that the grievance was satisfactorily settled on September 8, 1975.

By Harris' own admission, the alleged harassment and humiliation by Jones did not extend beyond two months following June 1975.

It is of further significance that Harris did not carry his grievances beyond the initial stage authorized by the employer-union contract, although the union committeeman, testifying in behalf of Harris made crystal clear that an appeal "to a higher step" would be taken, "If we felt the case warranted it." [9]

---

9. The local agreement between union and management relating to grievances (D. Ex. 2) included, *inter alia*, the following procedure:

"Step 2 — Shop Committee — Management Meeting

9. Failing satisfactory settlement by Higher Supervision, the grievance may be referred by the District Committeeman to the Shop Committee."

There is nothing in the record to indicate that appellee requested that Step 2 be initiated.

The agreement further provided, *inter alia:*

"11. Any grievance not appealed from a decision at one step of this procedure in the plant to the next step within five working days of such decision, shall be considered settled on the basis of the latest decision and not subject to further appeal."

### The Subject Case as to Jones

We think the motion for directed verdict as to Jones stands in a different posture and compels full examination of the facts as they relate to the essential elements of the new tort.

The Supreme Court of Virginia in *Womack v. Eldridge,* 210 S.E.2d 145 (1974), produced an admirable distillate from text writers and decisions to fix with reason, clarity and precision the boundaries of the new tort:

> "We adopt the view that a cause of action will lie for emotional distress, unaccompanied by physical injury, provided four elements are shown: One, the wrongdoer's conduct was intentional or reckless. This element is satisfied where the wrongdoer had the specific purpose of inflicting emotional distress or where he intended his specific conduct and knew or should have known that emotional distress would likely result. Two, the conduct was outrageous and intolerable in that it offends against the generally accepted standards of decency and morality. This requirement is aimed at limiting frivolous suits and avoiding litigation in situations where only bad manners and mere hurt feelings are involved. Three, there was a causal connection between the wrongdoer's conduct and the emotional distress. Four, the emotional distress was severe." 210 S.E.2d at 148.

We accept those boundaries of the tort.

### THE FACTS

#### The Conduct of Jones [10]

For about three months prior to June 2, 1975, and about two months after that date, Jones, who was at various times

---

**10.** Jones categorically denied the conduct attributed to him by Harris and a witness in his behalf. The recitations of fact contained in this section, however, are drafted to reflect the testimony most favorable to Harris. We are bound to assume their truth. Buchanan v. Galliher and Harless, 11 Md. App. 83, 87, 272 A. 2d 814, 817 (1971), cert. den., 1971.

a foreman and supervisor for General Motors, "would come by me and talk like me. In other words he would stutter like [me] two or three times a week." Harris fixed the time by reference to an occasion when he had approached Jones asking to be transferred to a different department and Jones had responded, "No, you are a troublemaker and get the hell out of here [and] said I should — always will call a committeeman." [11]

Perhaps because of Harris' impediment of speech the best description of Jones' conduct appears in the following testimony of co-worker Heinz DiPitro, called as a witness by Harris.

"Q Now, I want to direct your attention back to late May or June of 1975 and ask you whether or not you were present during a confrontation between Mr. Harris and Mr. Jones?

A Yes, I was.

Q Can you tell us in your own words what happened that day?

A Bill went up to talk to Mr. Jones to get a job in Seat Bay and I walked up to him and he asked him and Jones just smiled at him and he said, you can't have the job, he said, because you always call the mmittee man. When he said mmittee man he was mimicking Bill about his speech, shaking his head up and down. Like, he don't bring the word out, and he then told him to get the hell away from there.

Q Now, was he trying to say the word committee man?

A Yes, he was.

---

11. Although Harris indicated that the incident occurred on June 2, 1975, he filed, on July 3, 1975, an employee grievance (P. Ex. 1R) with respect to such an incident, charging a violation of § 63A of the national union-management agreement. That exhibit bore a notation dated July 10, 1975, that the grievance was not satisfactorily settled. A second notation on that exhibit showed that the grievance was satisfactorily settled on July 29, 1975.

Q Can you show the jury how Mr. Jones would enact this thing?

THE COURT: Demonstrate what Jones did, what you saw Jones — Mr. Jones do.

THE WITNESS: When Bill has trouble bringing a word out, he will, like, shake his head up and down, like that (indicating), getting the word out and that's what Bob Jones did.

Q (By Mr. Gibbons) Had you — did you ever see Mr. Jones mimick Mr. [Harris] on any other occasion?

A Yes, I have.

Q What did he say?

A He's always saying to Bill, you know, don't get nervous, and he said you're no good because you always want the committee man. He always said this to him.

THE COURT: I didn't hear you, Mr. Witness. Are you saying minni man or committee man? What are you saying.

THE WITNESS: Well, when Bill says committee man it sounds like mittee man. It doesn't come out all the right way.

THE COURT: What does Mr. Jones say?

THE WITNESS: Mmittee man. He tries to say the same thing that Bill does.

Q (By Mr. Gibbons) In other words, he's leaving off the c-o?

A Yes, he is."

The incidents occurred two or three times weekly over a five or six month period in the spring and summer of 1975.

### The Preexisting Condition of Harris

His wife of seven years testified that Harris "always had a speech impediment." She added:

"Q (By Mr. Gibbons) Can you describe his disability at that time?

* * *

THE WITNESS: He was sort of, like, in a shell. It took me a while for me to get him to associate with, like, my family and, you know, to go out and, you know, meet friends. But — and then afterwards he, you know, sort of came out of his shell and he still had a hard time talking but he was more or less, you know, calmer. He was more calmer.

Q (By Mr. Gibbons) How long did it take for him to come out of his shell, so to speak?

A Oh, I don't know exactly. I would say about maybe a year after we were first married.

* * *

Q Okay. Now, directing your attention to the Spring of 1975, did you notice anything unusual about Bill during that time of year?

A Well, it wasn't — I noticed it back in November [1974]. I was four months pregnant with my second boy. . . . and he would come home like late from work and I'd ask him why he was late and he would jump all over me and say, he had

a rough day at work. So I just, you know, I took it from that and he never explained anything or nothing else. . . . back in November I had left him for two weeks because his drinking became very heavy and we got to the point where we were at each other's throats and he threw a meat platter at me and I just, you know, told him when you straighten yourself out and continue to work and go in to work and just, you know, take it and then don't bring it home and bring it — take it out on me, then, I said, I'll come back and it was two weeks before my husband and I did reconcile and he said that he still had problems at work, but he would try not to take it out on me and my four-year old.

\* \* \*

THE COURT: When was the separation?

THE WITNESS: This was in '74 and in November."

The testimony of Harris included the following:

"Q Well, there are a lot of things that bother you that make you nervous, aren't there?

A Yes, there is.

Q And wasn't that why you went to see your doctor starting six years ago about this problem?

A (Thereupon, the witness wrote the answer down.)

Q Thank you. The answer is because of bosses. Oh, six years ago it was somebody else, some other boss that was giving you a problem?

A I don't know.

Q Well, six years ago is a long time before you met Mr. Jones, isn't it?

A Yes, it is."

■■■■■■■

■■■■■■■

### *The Evidence as to Emotional Distress*

Appellee's description of the results of Jones' conduct may be summarized as follows: that it caused him to complain four times to his work foreman and to request two hearings before the union representative; that the conduct made him "nervous and felt like going into a hole and hide"; that he had visited Dr. Zullo for medical attention during the period involved, and was given pills for his nerves. He acknowledged that he had been attended by the same doctor for six years with respect to his problem. Dr. Zullo did not testify.

He testified that his home life had been broken up for two weeks,[12] and that his condition had gotten worse during the period complained of. He acknowledged that he had had problems with other supervisors at work and had been "suspended or relieved on maybe 10 or 12 occasions for different things." He acknowledged that on one occasion he had followed another supervisor home on a motorcycle after a dispute and had been disciplined for his conduct in doing so. He acknowledged that there were a lot of tough guys in the plant and there was a lot of roughhousing and calling of names in the plant. At one point in his testimony appellee had stated that no other employee gave him "a hard time about [his] speech impediment." In later testimony, however, the record showed the following:

"Q So there were other employees down there that do mimick you on occasion, around there?

A Well, there's — yes, there is, I guess."

He acknowledged that a bad day at work causes his condition to be a little bit worse.

Appellee's witness DiPitro testified that after a confrontation with Jones, Harris "would be shaken up. He would be real nervous and walk away."

---

12. The wife of appellee, called as a witness in his behalf, made it crystal clear that the separation of husband and wife had occurred months before the commencement of the alleged harassment.

The appellee's wife thus described her husband's condition in June:

> ". . . then June, June of '75 my son was christened. We had a large christening party for my son and he got to drinking and I told him, you know, just stop drinking."

Asked to describe her husband's condition on the day of trial, she said "very nervous. He can hardly — he doesn't talk as good as he did when I sort of got him out of his shell . . . as compared to when we were first married and I got him to socialize and to, to meet people." When her attention was directed back to the separation of November 1974, she testified as follows:

> "Q All right, can you tell me what his condition was at that time? Describe his condition for the jury.
>
> A I didn't know — I would not let him come in contact with me or my son.
>
> Q Why not?
>
> A Because I was afraid of him. My doctor had told me to stay away from him. He had given me twenty milligrams of Librium I was to take every day. I was a nervous wreck. I didn't want to be around him.
>
> Q Now, can you describe for me or the jury his condition in 1975? Can you compare the two?
>
> A Well, in 1973, as like before, we were married, it — see, it was just everything was going along fine. He liked his job, he liked his work, he liked — we just moved into a brand new house, and it was just all right. It was just perfect to me."

### THE LAW APPLIED TO THE FACTS

*Tort Elements 1 and 2 (Intentional and Outrageous Actions)*

We are persuaded that the evidence was legally sufficient to establish that Jones' conduct was intentional; was

intended to inflict emotional distress; and was outrageous and intolerable in form. The evidence was legally sufficient to establish those elements of the offense.

### Tort Elements 3 and 4 (Severity and Causal Connection of Emotional Distress)

Our examination of the record as a whole persuades us that the evidence, viewed from the standpoint most favorable to the appellee, fails as a matter of law to bring the case within the legal boundaries of the new tort by reason of the absence of proof of either such element.

### Severity of the Emotional Distress

We think that the record makes plain that the impact of the Jones' harassment was not shown to have produced "severe emotional distress"; [13] "severe disturbance of mental or emotional tranquility"; [14] or "mental distress of a very serious kind." [15]

We say this in the light of the circumstances: (1) that the family separation took place prior to the occurrences complained of and (2) that a causal connection between Jones' conduct and appellee's actions at the family christening was not shown. All other alleged sequelae of Jones' conduct amount to no more than generalizations of "nervousness" or "irritation." Such sequelae, standing alone, are not within the purview of the tort.

### Causal Connection

We have heretofore stated that testimony offered on behalf of Harris showed that the family separation was not the product of Jones' conduct. The testimony of Mrs. Harris, produced by the appellee and by which he is bound,

---

13. The minimum requirement suggested by 1 Restatement of Torts 2d, *supra.*

14. The minimum requirement suggested by annotation 64 A.L.R.2d 100, *supra.*

15. The minimum requirement suggested by Prosser, Law of Torts, *supra.*

pinpointed that event as having occurred prior to the conduct complained of.

The christening incident also lacked the necessary showing of causal connection. Harris, prior to the inception of the Jones harassment, had conducted himself in a similar manner. Thus, there is nothing more than speculation to connect the christening incident with Jones' conduct.

Reinforcement for this view appears from the record showing that Harris had received medical treatment related to his "nervous" condition before the events complained of. A single visit to his family doctor, unaccompanied by medical evidence tending to establish that the medical treatment described by Harris flowed as a direct consequence of the Jones activities, makes the connection a matter of the purest conjecture.

We think Jones' motion for a directed verdict should have been granted.

Our reversal without a new trial obviates the necessity to consider the other contentions of the appellants.

> *Judgments reversed without a new trial.*
> *Appellee to pay the costs.*