# MURIEL GWENDOLYN VANCE *v.* ARNOLD LEONARD VANCE

[No. 384, September Term, 1978.]

*Decided January 11, 1979.*

The cause was argued before GILBERT, C. J., and MASON and LISS, JJ.

*Bernard F. Goldberg,* with whom was *Michael D. Rexroad* on the brief, for appellant.

*Thomas C. Gentner,* with whom were *Timothy E. Welsh, Robert W. Fox* and *Rollins, Smalkin, Weston, Richards & Mackie* on the brief, for appellee.

GILBERT, C. J., delivered the opinion of the Court.

The facts of this case would appear to be more at home in a plot of a "soap opera" than in a court of law because a recitation of them should begin with "Once upon a time...." Yet, there is evidence demonstrating that they are true, and truth, as Lord Byron said, "is always strange; Stranger than fiction." [1]

We are here concerned with a civil suit by a woman against a man for fraud, negligent misrepresentation, assault and battery, and the intentional infliction of emotional distress,[2] grounded on their ostensible relationship as husband and wife and growing out of a petition by the man to set aside an alimony and support decree because it was based on a "marriage" that never was. The petition was later withdrawn but by that time the fact that the "marriage" was invalid had been clearly established.

Before embarking on a discussion of the legal issues involved in this appeal, we shall endeavor to unravel the mare's nest in which the parties, Muriel Gwendolyn Vance, appellant, and Arnold Leonard Vance, appellee, find themselves entangled. To so do we shall attack the problem sequentially.

The appellee, during his residency at University Hospital in Baltimore City, separated from his then wife, Elizabeth Vance in "July or August" of 1954. In "September or October" of that same year, Dr. Vance met the appellant who was a registered nurse "working in OB at the time." The relationship between the parties intensified to the point where marriage was discussed. Dr. Vance reached an agreement with Elizabeth Vance. A hearing on the bill of divorce and

---

1. George Noel Gordon, Lord Byron, 1788-1824, in *Don Juan,* Canto XIV [1823] St. 101.

2. *See* Jones v. Harris, 35 Md. App. 556, 371 A. 2d 1104 (1977), *aff'd* 281 Md. 560, 380 A. 2d 611 (1977).

cross-bill was held before an examiner[3] on September 12, 1956. Additional testimony was taken on October 3, 1956. While Dr. Vance attended the September hearing, he was not present for the presentation of the additional testimony.

According to the appellant and her mother, the doctor appeared at their residence in "maybe the middle of September" 1956 and told appellant and her parents "that he had finally gotten his divorce from ... [Elizabeth], and that he was free, and that we [appellant and Dr. Vance] could plan our marriage at the end of the month." Arrangements were made for the couple to be wedded in Arlington, Virginia. Just who arranged for the "marriage" to take place in Virginia was disputed. Appellant testified that the doctor made the arrangements through a lawyer friend of his from Washington, D.C. Dr. Vance presented an entirely different version. He said all the arrangements were made by appellant.

In any event, the parties went through a religious ceremony before a Methodist minister on September 29, 1956. They had previously applied for and received a marriage license. The information on the application for the license was written by appellant who testified that she wrote "Divorced" "under the groom's information" because that is what Dr. Vance told her.

The decree of divorce was signed by a judge of the Circuit Court of Baltimore City on October 16, 1956 and sent to Dr. Vance by his then lawyer on November 6, 1956. It was mailed to the doctor's address at the hospital. Patently, Dr. Vance was not divorced from Elizabeth Vance at the time he entered into a "marriage" with the appellant. The impediment of a prior, valid, existing marriage blocked a valid marriage to appellant.[4] Dr. Vance stated that the appellant knew that his

---

3. In 1956 the practice in Baltimore City was that testimony in an uncontested divorce was heard by an examiner. The testimony was typed and sent to a Master who made a recommendation, based thereon, to the chancellor. That practice was abandoned in favor of the current Master-Examiner's role being filled by the same person.

4. Md. Ann. Code art. 16, § 24; Clayton v. Clayton, 231 Md. 74, 188 A. 2d 550 (1963); Townsend v. Morgan, 192 Md. 168, 63 A. 2d 743 (1949). "A second marriage contracted while a first marriage exists undissolved is a nullity without the passage of any judicial decree declaring it void." *Id.* at 173, 63 A. 2d at 745.

divorce from Elizabeth Vance was not final, but she, nevertheless, insisted upon going through with the ceremony. Appellant steadfastly denied knowing that the doctor was legally incapable of entering into a valid marriage when the two were supposedly wed. Appellant learned that they were not in fact and in law married [5] when the doctor's petition to set aside the alimony and support decree was filed.[6]

Muriel Vance's reaction to the news of the invalidity of her marriage is the foundation of the matter before us. This litigation began in the Circuit Court for Howard County, Maryland, on August 2, 1976, when appellant filed a four-count declaration against Dr. Arnold Vance, alleging, as we have previously stated, fraud, negligent misrepresentation, assault and battery, and intentional infliction of emotional distress.

Upon the close of evidence, but prior to submitting the case to the jury, Judge James Macgill granted Dr. Vance's motion for a directed verdict on the count alleging intentional infliction of emotional distress. The remaining counts were submitted to the jury which returned a verdict for appellant on the negligent misrepresentation, awarding her fifty-thousand dollars ($50,000) in compensatory damages.

The trial judge thereafter granted Dr. Vance's motion for a judgment N.O.V. Subsequently, the court stayed its action and granted a rehearing, after which the judgment N.O.V. was reinstated.

In her appeal to this Court, the appellant does not contest the jury's verdict on the fraud and assault and battery counts, thus abandoning those claims. The appellant does, however, level a barrage against the trial judge's granting of the motion *non obstante veredicto* as well as the directed verdict on her allegation of the intentional infliction of emotional distress. We conclude that the appellant is justified in asserting that the rulings call for reversal and remand for a new trial. We shall now explain why we so believe.

---

5. *See* n. 4, *supra.*
6. *But see* Clayton v. Clayton, *supra,* and Dackman v. Dackman, 252 Md. 331, 250 A. 2d 60 (1969).

## THE JUDGMENT N.O.V.

It is settled law that in reviewing a trial court's grant of a motion for a judgment N.O.V., the evidence and all reasonable inferences which can be drawn from it must be considered in the manner most favorable to the party against whom the ruling was made. *Menish v. Polinger Co.,* 277 Md. 553, 567, 356 A. 2d 233, 240 (1976); *Wesko v. G.E.M., Inc.,* 272 Md. 192, 200, 321 A. 2d 529, 534 (1974); *Gill v. Computer Equipment Corp.,* 266 Md. 170, 173, 292 A. 2d 54, 55 (1972); *Lusby v. First National Bank,* 263 Md. 492, 499, 283 A. 2d 570, 573 (1971); *Wheeler Transportation Co. v. Katzoff,* 242 Md. 431, 435, 219 A. 2d 250, 252-53 (1966); *Safeway Stores, Inc. v. Bolton,* 229 Md. 321, 326, 182 A. 2d 828, 830 (1962); *Smith v. Bernfeld,* 226 Md. 400, 405, 174 A. 2d 53, 55 (1961); *Zeamer v. Reeves,* 225 Md. 526, 530, 171 A. 2d 488, 490 (1961); *Hess v. Frazier,* 27 Md. App. 150, 169, 340 A. 2d 313, 323, *cert. denied,* 276 Md. 745 (1975); *Cluster v. Cole,* 21 Md. App. 242, 249, 319 A. 2d 320, 324-25 (1974); *Hagen v. Washington Suburban Sanitary Commission,* 20 Md. App. 192, 195, 314 A. 2d 699, 700 (1974). We view the evidence and all reasonable inferences which can be drawn from it as supporting compensation for the emotional distress suffered by appellant as a result of her belatedly learning that her ostensible marriage to Dr. Vance was a sham.

The trial judge, in granting the judgment N.O.V., bottomed his decision on the reasoning "that damages consisting solely of mental distress are not recoverable in an action for negligent misrepresentation." The underlying determination of negligent misrepresentation was not questioned, with the result that we shall do no more with respect thereto than note that we have reviewed the record and ascertained therefrom that a finding of negligent misrepresentation was supported by the evidence presented.

The record reveals the following facts and rational inferences deducible therefrom concerning recovery for mental distress. Dr. Arnold Vance was not free to marry appellant in September 1956 because his divorce *a vinculo matrimonii* from Elizabeth Vance was not final until October

16, 1956. Accounting at a minimum from November 1956, the appellee was aware of the discrepancy in dates among his statements to appellant that he was free to marry, the "marriage" date, and the decree of divorce.

Appellant, on the other hand, disavowed all knowledge of the bigamous nature of her "marriage" to Dr. Vance until 1976 when he filed the motion to annul the marriage and strike the decree awarding her alimony and child support. Appellant's asserted lack of knowledge was supported by evidence that the decree of divorce between Arnold and Elizabeth Vance had been received by the doctor at his place of business, not at the home he shared with the appellant. It was not likely that appellant would have seen the divorce decree unless Dr. Vance took it home and showed it to her. Although the parties disagree as to whether the doctor ever showed appellant the decree, the testimony of Mitchell Vance, their son, underpinned his mother's statement that she had not seen the decree before 1976.

Furthermore, appellant testified to her emotional reaction to the news of the invalidity of her marriage. She said:

> "I just—I couldn't function, I couldn't sleep, I was totally embarrassed by the fact that he had filed this and it became public knowledge, once it's filed. I consider it defamation of my character. I was too embarrassed to go out and socialize with people that tried to be kind to me. And I just couldn't function. I really thought I was going to have a nervous breakdown. And I even now have symptoms of an ulcer."

Her testimony was corroborated by that of both her mother, Mrs. Hewell, who stated that after March 26, 1976 her daughter was in a state of emotional collapse, and Walter Hess, appellant's son by a previous marriage, who testified that his mother was in such a state of emotional depression that it scared him. He specifically related that:

> "I've been told that my mother is an attractive woman, and during this period of time, there was,

there was absolutely no beauty or life to her. The hair was unkept *(sic)*, the cheeks were sunken, the eyes were dark. She was a wreck. . . .

. . .

". . . When my mother needed me, she called me. I either went to her home, or we had long, long discussions on the telephone. And during the periods that, you know, long periods of sobbing and crying and so on and so forth where I felt that I wasn't even communicating with my mother, I felt that she was totally detached from the situation, and really was unware of, of her own presence."

We think such evidence demonstrated that the appellant suffered from emotional distress as a result of learning that her "marriage" of almost 20 years was no marriage at all.

It is well established in Maryland that there is a right of recovery for emotional distress if it results in physical injury. *Bowman v. Williams,* 164 Md. 397, 165 A. 182 (1933); *Great Atlantic & Pacific Tea Co. v. Roch,* 160 Md. 189, 153 A. 22 (1931).

*Bowman* permits recovery for emotional distress "resulting in some clearly apparent and substantial physical injury, as manifested by an external condition or by symptoms clearly indicative of a resultant pathological, physiological, or mental state." The trial judge in the instant case opined that:

"[B]efore recovery can be had for nervous shock, it must be shown that such shock caused a physical or mental condition in the nature of an ailment or illness as distinguished from emotional distress or mental anguish in the nature of embarrassment or depression. There was nothing in the evidence in the instant case to indicate that the plaintiff suffered a physical or mental illness or injury as a result of her shock on learning that her marriage was invalid."

We have a different view. As we see it, the evidence, considered in the light most favorable to appellant, was

sufficient to support a jury's finding that appellant was "physically injured" as a result of learning that her marriage to Dr. Vance was invalid.

According to *Bowman,* the physical injury may be manifested either by an "external condition" or "by symptoms clearly indicative of a resultant pathological, physiological or mental state." We think the evidence in the case *sub judice* supports a finding by the jury of physical injury from the appellant's "external condition." Appellant's nervousness, spontaneous crying, hollowed appearance, and inability to relate to the present, all constituted evidence of an external condition.

We digress to consider, as an aside, the resultant physical injury rule.

Recovery is generally denied for negligently inflicted mental disturbance when there is no accompanying physical injury or physical consequences. Prosser, *The Law of Torts* 328-29 (4th ed. 1971). There is, in other jurisdictions, a clear exception to the general rule. The exception permits recovery when there is no essential reason to deny it, in that the circumstances of the case present "an especial likelihood of genuine and serious mental distress ... which serves as a guarantee that the claim is not spurious." Prosser, *supra* at 330. The law protects a person's property, physical composition of his body and his mental well-being.[7]

Two objections voiced against permitting recovery for damage to the mental health, unaccompanied by physical injury are the ever present possibility of vexatious or fictitious claims and an increase in the number of law suits. The former, as we see it, is no more valid in such claims than in other types of litigation, and the latter is not the slightest justification for denying a forum in which to seek redress.[8]

---

[7]. *See e.g.,* Md. Ann. Code art. 43; 42 U.S.C. §§ 242a, 2661, and 2681, and generally, libel, slander, and other rights of privacy actions.

[8]. The inappropriateness of placing expediency before justice was recognized in Green v. Shoemaker & Co., 111 Md. 69, 81, 73 A. 688 (1909). The Court, in awarding damages for nervous injury caused by fright, without physical impact, stated: "The argument from mere expediency cannot commend itself to a Court of justice, resulting in the denial of a logical legal right and remedy in *all cases,* because in *some* a fictitious injury may be urged as a real one." *Id.* at 81, 73 A. at 692.

We believe it is time that courts unbind themselves from the outmoded belief that there can be no injury to the mind without overt manifestations of bodily harm. We should recognize what the health professionals already know, that the psyche is as susceptible of injury as the body,[9] and that the absence of apparent physical damage does not serve to lessen the extent of the mental injury. *See Howard v. Lecher,* 42 N.Y.2d 109, 111-12, 366 N.E.2d 64 (1977); *Johnson v. State,* 37 N.Y.2d 378, 381-84, 334 N.E.2d 590 (1975); *Battalla v. State,* 10 N.Y.2d 237, 239-42, 176 N.E.2d 729 (1961).

## *THE DIRECTED VERDICT.*

The appellant asserts that the trial judge should not have directed a verdict on her claim for damages resulting from the intentional infliction of emotional distress.

The judge, in granting the motion for the directed verdict, said:

> "The reasons for my action on this count is, first of all, I find no legally sufficient evidence to indicate, assuming that there was a fraudulent representation as to the marital status of Dr. Vance at that time, that it was done . . . with the intention of the infliction of emotional distress upon . . . [appellant]."

The judge went on to explain that in his opinion the count was no more than a duplication of the count charging fraud.

---

**9.** *See generally* "Testimony by the American Psychological Association, The Council for the Advancement of the Psychological Professions and Sciences and the Association for the Advancement of Psychology to the Committee on Ways and Means, U.S. House of Representatives: Subcommittee on Health—on the subject of National Health Insurance," November 14, 1975. References therein demonstrate the growing acknowledgment that mental health services deserve recognition on a parity basis with physical services. This trend is reflected by the number of major health insurance carriers that have voluntarily added psychologists as autonomous providers of services. Legislation on both the state and federal levels has in many instances eliminated the need for physician referral or supervision as a prerequisite to obtaining coverage for the costs of mental health services. The Maryland Legislature has mandated that medical health insurance plans incorporate the change. Md. Ann. Code art. 48A, § 477E. *See also,* "Testimony of The American Psychological Association on the subject of Mental Health Services Under Medicare and Medicaid," August 18, 1978.

Perhaps the trial judge was misled by the name given to the "new tort," [10] first recognized in this State in *Harris v. Jones,* 35 Md. App. 556, 371 A. 2d 1104 (1977), *aff'd* 281 Md. 560, 380 A. 2d 611 (1977). Despite the characterization of the tort as the *intentional* infliction of emotional distress, and notwithstanding the use of the adjective *intentional* in its title, the tort need not be *intentional.* The actor is responsible if the injury is inflicted by extreme and outrageous recklessness.

Before there can be a justiciable infliction of emotional distress, four elements must fuse. They are:

(1) Intentional or reckless conduct;
(2) Extreme and outrageous conduct;
(3) A causal connection between such conduct and the emotional distress;
(4) Emotional distress of a severe nature.

*Harris v. Jones,* 281 Md. at 566, 380 A. 2d at 614; *Womack v. Eldridge,* 215 Va. 338, 210 S.E.2d 145 (1974).

It is to be noted that the actionable conduct is not limited to its being intentionally inflicted. *Harris* and *Womack* made pellucid that when one "acts recklessly in deliberate disregard of a high degree of probability that . . . emotional distress will follow," 281 Md. at 567, 380 A. 2d at 614, he is as accountable as if he had acted intentionally. In short, reckless disregard in a given factual situation may be equated to intentional infliction, but not be so considered when viewed in different circumstances. The Restatement (Second) of Torts, ch. 2, § 46 (1965), Comment f explains that the "extreme and outrageous" nature of the actor's conduct may arise from his knowledge "that the . . . [victim] is peculiarly susceptible to emotional distress, by reason of some physical or mental condition or peculiarity." Conduct may be adjudged to be "heartless, flagrant and outrageous" when, notwithstanding the actor's knowledge of what it will likely occasion, he nevertheless perpetrates it, while, if he lacked

10. Judge Menchine, who authored *Harris* for this Court observed that while the case was "one of first impression in Maryland," it is recognized favorably by a "majority of the States." 35 Md. App. at 558, 371 A. 2d at 1106.

that knowledge, his conduct would not be so considered. "[M]ajor outrage is essential to the tort. . . ." *Id.*

Chief Judge Murphy, for the Court of Appeals in *Harris,* illustrated the importance of the circumstances in which such conduct takes place. He said:

> "In determining whether conduct is extreme and outrageous, it should not be considered in a sterile setting, detached from the surroundings in which it occurred. *Pakos v. Clark,* 253 Or. 113, 453 P. 2d 682 (1969). The personality of the individual to whom the misconduct is directed is also a factor. 'There is a difference between violent and vile profanity addressed to a lady, and the same language to a Butte miner and a United States marine.' Prosser, *Intentional Infliction of Mental Suffering:* A New Tort, 37 Mich. L. Rev. 874, 887 (1939)." [11] 281 Md. at 568, 380 A. 2d at 615.

There is, as can be readily seen by the four elements articulated in *Harris* and iterated above, no need for fraud to be demonstrated. Hence, the judge erred in equating the fraud count with the intentional or reckless infliction of an emotional injury count. The finding of fraud may establish the element of intent but hardly recklessness. Indeed, fraud usually arises from a preconceived plan rather than any reckless conduct. Recklessness and fraud appear to be almost incompatible.

We agree, however, with the trial judge that the evidence does not establish that Dr. Vance intentionally inflicted emotional injury upon the appellant, but whether he did so with extreme and outrageously reckless conduct is another matter. If there was evidence, however slight, when

---

[11]. We infer that Prosser used the noun "lady" to mean a refined, gentle woman possessing those characteristics often associated with culture, breeding, and high station, and not as a mere synonym for "female." Why he implies a "Butte miner *and* a United States marine" would be less offended by the language is unexplained. In any event, we think it the height of reckless and extreme folly to address "violent and vile profanity" to a Butte miner *and* a marine, while such remarks to the miner *or* the marine require only courage.

considered most favorable to the appellant,[12] of the four fused elements of *Harris,* the count should have gone to the jury. *Mass Transit Administration v. Miller,* 271 Md. 256, 315 A. 2d 772 (1974); *C.S. Bower Co. v. Maryland National Bank,* 36 Md. App. 26, 373 A. 2d 30 (1977). We think the evidence as recounted in the facts heretofore stated is of such a nature that the trial judge should not have invaded the province of the jury, but should have left to them the determination of whether Dr. Vance's conduct was reckless to the point of being extreme and outrageous. The directed verdict was erroneously granted.

There can, of course, be only one recovery,[13] *i.e.,* appellant may not recover for negligent misrepresentation and at the same time successfully assert that appellee inflicted an intentional tort upon her by his extreme reckless and outrageous conduct, inasmuch as the two torts are mutually exclusive.

We shall reverse the matter and remand it to the trial court where the appellant may elect either to accept the verdict rendered by the jury on the negligent misrepresentation count or retry the case on the two counts we have here considered. If appellant opts to accept the verdict of the jury for negligent misrepresentation resulting in emotional distress, the trial judge shall reinstate the jury verdict and enter judgment thereon.

> *Judgment reversed.*
> *Case remanded for further pro-*
> *ceedings consistent with this*
> *opinion.*
> *Costs to be paid by appellee.*

---

**12.** Md. Rule 552 requires that all facts and inferences reasonably deducible therefrom must be considered in the light most favorable to the party against whom the motion for a directed verdict is made. Only when the facts or inferences drawn therefrom lead to but one conclusion is a court justified in directing a verdict.

**13.** "[T]here can be but one recovery for a single wrong. . . ." Pemrock, Inc. v. Essco Co., 252 Md. 374, 379 (1969).