553 A.2d 1285

Bette VAULS, et al.

v.

Nick G. LAMBROS, et al.

No. 742, Sept. Term, 1988.

Court of Special Appeals of Maryland.

March 2, 1989.

Neal S. Wadler (Goldman & Skeen, P.A., on the brief), Baltimore, for appellants.

Constance D. Burton (Robert H. Bouse, Jr., and Anderson, Coe & King, on the brief), Baltimore, for appellees.

Argued before MOYLAN and BISHOP, JJ., and JAMES S. GETTY, Associate Judge of the Court of Special Appeals (retired), Specially Assigned.

JAMES S. GETTY, Judge, Specially Assigned.

The single issue to be decided in this case is whether the trial court erred in granting judgment notwithstanding the verdict on the issue of intentional infliction of emotional distress. We hold that the court did not err and, therefore, the judgment of the Circuit Court for Baltimore County (Smith, J.) is affirmed.

Bette Vauls, appellant herein, is a sixty-year-old woman who became a member of Jehovah's Witnesses in 1967. According to her testimony, appellant was a joyful person with no history of paranoia who "ate, slept and drank" her religion. It is fair to say that some part of each day was devoted to religious activities.

Appellant's difficulties with the appellee, Nick G. Lambros, an elder in the church, commenced in 1976. It is important to note that the court instructed the jury that due to the statute of limitations applicable to this case, only acts committed by appellee after February 5, 1982, could be considered in deciding the issue of intentional infliction of emotional distress. The court allowed testimony of acts allegedly engaged in by appellee prior to February, 1982, for the limited purpose of showing appellee's state of mind, *i.e.*, intent.

We shall set forth all of the alleged acts initiated by appellee and then reduce that testimony to the matters that the jury was entitled to consider on the issue of intentional infliction of emotional distress.[1] In 1976 appellee attempted

---

1. Appellee introduced substantial evidence disputing appellant's allegations. We recite the facts favorable to the appellant, assuming the

to persuade appellant's fourteen-year-old daughter to leave her mother's home and reside with another church family, because appellee did not consider the child's home environment to be appropriate. When appellant resisted this intrusive effort, appellee challenged appellant's maternal fitness. In 1979, appellee forced appellant's daughter to attend a judicial meeting of the church although he knew that the girl, then eighteen, had no further interest in the church. Appellant was not permitted to attend the meeting concerning her daughter because appellee denied her request to attend.

Other pre–1982 indignities suffered by appellant included a threat of disfellowship [2] from the church for rejecting appellee's advice concerning her daughter; in 1976, appellee called her a "heretic" and a "bitch"; and in 1979 and 1980 appellee began following her in his car. The combination of these activities, according to appellant, caused her to suffer "anxiety attacks," "fear and sweat," and "fright-nausea."

Turning to the critical period, 1982–1984, appellant testified that the unauthorized surveillance continued, including several occasions when appellee parked outside her residence and "watched the house." On one such occasion appellee engaged in a seldom defined, but universally understood, opprobrious act, he "gave her the finger." A more provocative event occurred in the latter part of 1982 when appellee visited appellant at her home and accused her, falsely, she maintains, of slandering a relative of another member of the church. Appellee told appellant that

truth thereof, since this is the applicable standard for review of judgments *n.o.v.* *Impala Platinum, Ltd. v. Impala Sales*, 283 Md. 296, 389 A.2d 887 (1978).

**2.** Disfellowship is described as a proceeding initiated by the elders of the church against a member of the congregation who commits an unscriptural infraction such as adultery or drunkenness. Once disfellowship is proclaimed, the actor is "shunned" by the congregation for fear of contamination of other members. The stigma may be removed by the actor demonstrating acceptable repentance. In the interim, a disfellowshipped member may continue to attend church services.

he directed the member to tape a telephone conversation between appellant and the member and turn the tape over to appellee. Thereafter, the surreptitiously recorded telephone conversation was used against appellant in a disfellowship proceeding conducted by the church elders. In November, 1982, appellant was disfellowshipped for reasons that she claims were never explained to her. Shortly after the proceeding, appellee told appellant, "I have got you and I'm going to get your daughter and your husband."

Returning to church services after the disfellowship proceeding, appellant was informed by appellee that she was to sit in the last seat in the back row of the church despite the fact that no such "back row" rule existed. In fact, the appellee's children continued to sit with him after being disfellowshipped for immorality. Appellant considered this indignity as analogous to the long rejected custom of requiring some citizens to sit in the back of a bus.

The disfellowship caused appellant to become "grief stricken to this very day." Her initial reaction was to demolish a six hundred dollar typewriter, throw all of her clothes out of the drawers and then break all of the drawers in the dresser.

Appellant explained that under the procedure followed in the church, within a week to ten days after a member is disfellowshipped, it is customary for someone in authority at a church meeting, presumably an elder, to address the congregation, generally, on the subject of the errant member's transgression without identifying the person by name. In the presence of one hundred members, appellee began this ritual by looking directly at appellant and proclaiming, "there is an apostate [3] sitting amongst us."

The disfellowship action combined with the apostacy speech had the following impact on appellant, according to her testimony:

---

**3.** An apostate was defined by another witness as one who speaks against scriptural teaching and returns to church and tries to cause divisions therein.

I felt devastated ... when is it going to end? ... I felt that I wanted to go home and cry ... I went home and cried ... I stayed a recluse ... I didn't want to take care of household duties ... I shut myself in my room for days on end, I didn't want to do anything or have anything to do with anybody ... I have shed more tears over this incident than anything else in my entire life and I am 60 years old.

In February, 1983, appellant sought a rescission of her church status. After denial of her request, she stopped attending services within a year.

Appellant's testimony was corroborated by her husband who said that after all that had taken place he never knew when his wife picked up an object in the home "whether she was going to dust it or break it." Expert testimony by Dr. Gerald Bergman, a psychologist, indicated that appellant was suffering from a transient stress disorder which he defined as "a great deal of stress prolonged over a long period of time." Dr. Bergman was not providing therapy for appellant, because his contacts with her were by telephone, once a year, in 1983, 1984 and 1985. The expert met appellant for the first time approximately one week before trial. Dr. Bergman characterized the appellant as being neither paranoid nor hypersensitive, he could not, however, attribute the severe and extreme emotional distress suffered by appellant to any particular encounter with appellee, or to any specific series of events that occurred after 1982. In short, his opinion was predicated upon an accumulation of traumatic events that preceded the February 1982 date and, moreover, encompassed events that the court ruled could not be considered by the jury which included disfellowship.

In instructing the jury, Judge Smith cautioned:

You are instructed that a clergyman may not with impunity intentionally inflict severe emotional distress on anyone, but you are further instructed that any conduct by the defendant, Nick Lambros, that occurred in the course of his service as an Elder in the Jehovah's Witnesses

cannot be the basis for recovery for intentional infliction of emotional distress.

Consequently, you cannot award any damages for any conduct and/or actions which you find were in his capacity as an Elder in the Jehovah's Witnesses and you may not award any damages nor consider any such acts as intentional infliction of emotional distress upon the Plaintiff.

This instruction is not challenged by appellant on appeal. At the close of the case, appellee's motion for judgment was reserved by the court. The case was submitted to the jury and the verdict was for the appellant in the amount of one thousand dollars compensatory damages and two thousand dollars as exemplary damages. Thereafter, the court scheduled the case for argument on the reserved motion and, at the conclusion thereof, granted appellee's motion for judgment notwithstanding the verdict. A timely appeal was entered by appellant.

Judge Smith, in ruling on the reserved motion, identified, in the light most favorable to appellant, the conduct that the jury could properly consider in deciding the issue of intentional infliction of emotional distress. He said:

The conduct occurring after 1982 included Mr. Lambros' instruction to Ms. Rossini to make a tape and his use of the tape after it was made; the 1982 threat after Mrs. Vauls' disfellowship that he would have her husband and daughter disfellowshipped also; the times, whatever number of times there were, between 1982 and 1982 [sic] during which Mr. Lambros was outside of Mrs. Vauls' home; the two occasions in which he followed her in his car; one occasion when he gave her an obscene gesture and one occasion when he told her to sit in the back of the Kingdom Hall after her disfellowship; and looking at her during his delivery of his sermon on apostacy in the church.

We note that the court thoroughly instructed the jury that it could not as a matter of law consider any damages to the appellant arising from her disfellowship, or for any

emotional distress she may have suffered as a result thereof. To rule otherwise, the court stated, would violate the doctrine of separation of church and state by permitting the judicial branch of government to regulate established church or religious doctrine.

Judge Smith held that the conduct which the jury was instructed to consider did not arise to the outrageous and extreme conduct necessary to establish the tort of intentional infliction of emotional distress and that the distress was not severe. He addressed the various factual episodes of alleged extreme and outrageous conduct, stating:

> With respect to the ... tape recording, it may be a violation of the law, but being a violation of the law does not make the conduct outrageous within the parameters of intentional infliction of emotional distress ... The plaintiff ... taped conversations of other elders without their knowledge ... It is offensive conduct, but offensive conduct is insufficient to rise to the level of outrageousness required ...

> With regard to the tape ... and the fact that it was turned over to the elder to the severe ... or extreme emotional distress ... the court finds that the emotional distress testified to by the plaintiff from that incident ... was not extreme.

> [Appellee's] sitting around the house ... does not amount to the outrageous conduct required ... Sitting in the back of the church on one occasion ... fails completely to so qualify ... There is no testimony that Mrs. Vauls always sat in the back of the church after that comment was made ... [it] is not the kind of outrageous conduct envisioned by the ... tort.

> The obscene gestures ... has been addressed in a number of cases and that is again just offensive conduct no doubt, but not such as would warrant the allowance of damages under the ... tort.

> Looking at the plaintiff when giving the apostacy sermon. Again, this is a matter that may be meaningful to the Plaintiff ... the apostacy sermon has been given a num-

ber of times before ... so it was not unusual in that church ... Mrs. Vauls herself characterized it as not showing love. Well, not showing love does not equate to extreme and outrageous conduct ...

So, having looked at the conduct individually and collectively, as a matter of law this court determines that the second requirement of the intentional infliction of emotional distress has not been met.

We test the court's judgment by a review of the applicable law. The tort of intentional infliction of emotional distress was recognized by the Court of Appeals for the first time [4] in *Harris v. Jones,* 281 Md. 560, 380 A.2d 611 (1977). Citing with approval the case of *Womack v. Eldridge,* 215 Va. 338, 210 S.E.2d 145 (1974), the Court identified four elements which must coalesce to impose liability:

1. The conduct must be intentional or reckless;

2. The conduct must be extreme and outrageous;

3. There must be a causal connection between the wrongful conduct and the emotional distress;

4. The emotional distress must be severe.

The elements of the tort are set forth in substantially the same language in Restatement (Second) of Torts, ch. 2, sec. 46 (1965), which states:

Sec. 46  *Outrageous Conduct Causing Severe Emotional Distress*

(1) One who by extreme and outrageous conduct intentionally and recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.

---

**4.** The Court of Special Appeals recognized the tort in a case of first impression in Maryland in *Jones v. Harris,* 35 Md.App. 556, 371 A.2d 1104 (1977), in an opinion by Judge W. Albert Menchine. On *certiorari,* the Court of Appeals affirmed. 281 Md. 560, 380 A.2d 611.

Turning our attention to the case law, we note that in *Harris, supra,* the plaintiff Harris was physically and verbally mimicked by his supervisor, Jones, for a period of five months due to Harris' inability to speak without stuttering. As a result of this harassment, Harris testified, his nervous condition worsened and his stuttering intensified. Harris had been under the care of a physician for his nervous condition for six years prior to his problems with Jones. The case was submitted to a jury which returned a verdict for the plaintiff. On appeal to this Court the verdict was reversed for insufficient evidence as to elements 3 and 4 of the tort, *i.e.,* a causal connection between Jones' conduct and Harris' emotional distress, or that the emotional distress was severe.

In its discussion of the "extreme and outrageous" element of the tort, the Court of Appeals (Murphy, C.J.) cited with approval from Sec. 46 of the Restatement, comment d, which states that liability does not extend:

> to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities....

A series of cases followed the recognition in *Harris* of the tort of intentional infliction of emotional distress, each seeking an extension of the principles set forth therein to other factual scenarios. Most of the cases have failed to extend the doctrine. *Continental Casualty Co. v. Mirabile,* 52 Md.App. 387, 449 A.2d 1176 (1982), involved an action by an employee against a supervisor who repeatedly evaluated the employee as marginal, made faces and screamed at him and humiliated him by constantly moving him from one desk to another. A similar fate befell the plaintiff in *Beye v. Bureau of National Affairs,* 59 Md. App. 642, 477 A.2d 1197 (1984), where a discharged employee sought to recover damages from a supervisor who allegedly gave the plaintiff poor ratings, promoted less qualified individuals and tricked the plaintiff into resigning.

Two other cases holding that the facts alleged were insufficient to support a cause of action for intentional infliction of emotional distress involved debt collection agen-

cies. In *Dick v. Mercantile–Safe Deposit and Trust Co.,* 63 Md.App. 270, 492 A.2d 674 (1985), and in *Hamilton v. Ford Motor Credit Co.,* 66 Md.App. 46, 502 A.2d 1057, *cert. denied,* 306 Md. 118, 507 A.2d 631 (1986), the collection agents engaged in a continuous course of harassing and threatening conduct including constant telephone calls, threats to ruin credit, attach property, and accusing the debtors of lying. *Hamilton,* like the present case, involved a judgment *n.o.v.* entered by the trial court which was affirmed on appeal.

On two occasions we have determined that the evidence was sufficient to support a claim for damages for emotional distress. *Reagan v. Rider,* 70 Md.App. 503, 521 A.2d 1246 (1987), involved molestation of a child which necessitated several years of therapy for the victim. The earlier case of *Moniodis v. Cook,* 64 Md.App. 1, 494 A.2d 212 (1985), is helpful in making a comparison with the present case. In both cases the court was dealing with sensitive, dedicated women. Mrs. Cook's commitment was to her job; Mrs. Vauls was very much involved in her church. The treatment accorded Mrs. Cook included attempting to force her to submit to a polygraph examination, reducing her working hours, threatening her with a transfer, testifying against her in an unemployment compensation hearing and ultimately firing her. The employer was insisting on the polygraph due to inventory shortages at certain Rite–Aid stores.

Mrs. Cook suffered to some degree from a pre-existing nervous condition. Her emotional state, following her discharge, deteriorated significantly. She became a recluse, consumed greater amounts of medication, slept most of the time, avoided contact with her neighbors and was unable to perform routine housekeeping chores for more than a year. The intent of management was to impose such conditions on those who refused polygraph tests that continued employment would be intolerable. It succeeded. On these facts, we held that whether the testimony had met the four factors set forth in *Harris* was a jury question.

The actions taken against Mrs. Cook were substantially more oppressive than the name calling, surveillance, obscene gesturing, threats to disfellowship her husband, telling appellant where to sit in church and having a telephone conversation recorded. We need not decide whether appellee's conceded intentional conduct was extreme and outrageous, because the emotional distress was not established as being "severe" in the sense that it was "of such substantial quantity or enduring quality that no reasonable man in a civilized society should be expected to endure it." *Fletcher v. Western National Life Ins. Co.*, 10 Cal.App.3d 376, 397, 89 Cal.Rptr. 78 (1970).

In *Harris, supra,* the Court of Appeals cited *Knierim v. Izzo,* 22 Ill.2d 73, 174 N.E.2d 157, 164 (1961), on the severe emotional distress required to support an action for the tort.

> [N]ot ... every emotional upset should constitute the basis of an action. Indiscriminate allowance of actions for mental anguish would encourage neurotic overreactions to trivial hurts, and the law should aim to toughen the psyche of the citizen rather than pamper it. But a line can be drawn between the slight hurts which are the price of a complex society and the severe mental disturbances inflicted by intentional actions wholly lacking in social utility.

*Harris,* 281 Md. at 571, 380 A.2d 611.

By her own testimony appellant established that she was "grief stricken to this very day" by the disfellowship proceeding. This incident precipitated the destruction of property and furnishings in her home. From the record it is clear that the stigma attached to that action was the most grievous affront suffered by appellant. We point out, however, that the church proceeding could not be considered as an element of emotional distress.

After leaving the church, appellant continued working in her husband's business, performed her housekeeping activities and started her own support group. Rather than revealing a woman suffering severe emotional distress,

appellant, to her credit, reflects one who has risen above the indignities she encountered in her church activities.

JUDGMENT AFFIRMED.

COSTS TO BE PAID BY APPELLANT.