502 A.2d 1057

**Sharon Marie HAMILTON et al.**

v.

**FORD MOTOR CREDIT COMPANY et al.**

**No. 405, Sept. Term, 1985.**

Court of Special Appeals of Maryland.

Jan. 13, 1986.

Certiorari Denied May 2, 1986.

**48**

Matt M. Paavola (John Terziu, III, on brief), Baltimore, for appellant.

Daniel Karp (Allen, Thieblot & Alexander, on brief), Baltimore, for appellee.

Argued before BLOOM and ROBERT M. BELL JJ., and W. ALBERT MENCHINE, Associate Judge of the Court of Special Appeals (retired), specially assigned.

BLOOM, Judge.

Ford Motor Credit Company (FMCC) repossessed a motor vehicle that had been purchased by Sharon Marie Hamilton and her mother, Verna Hamilton, and financed through an installment sales contract that was assigned to FMCC. Because of FMCC's conduct before and after repossessing the vehicle, a jury in the Circuit Court for Baltimore County awarded the Hamiltons verdicts totalling $64,757.20 against FMCC and one of its employees, Bernard Alaimo. Judge John F. Fader, II, who had presided over the trial, granted a judgment N.O.V. with respect to one of the Hamilton's claims, reducing the verdict total to $12,206.20. Both Sharon and Verna appealed. FMCC and Alaimo cross-appealed, contending that the remaining verdicts resulted from errors committed by the trial judge.

The Hamiltons complain that Judge Fader erred

1. In granting judgment N.O.V. against them in their claim for intentional infliction of emotional distress;

2. In dismissing their claim for negligent infliction of emotional distress on the ground that Maryland does not recognize that cause of action; and

3. In ruling that only Sharon Marie Hamilton, and not Verna Hamilton, could maintain a cause of action for conversion of the motor vehicle.

FMCC and Alaimo contend that Judge Fader erred

4. In admitting evidence as to FMCC's net worth;

5. In refusing to instruct the jury that under the laws of Florida, where it repossessed the Hamiltons' vehicle, FMCC had a right to insist on receiving the entire balance of the secured debt before releasing the vehicle; and

6. In submitting to the jury the Hamiltons' claim for damages for violations of the Maryland Consumer Debt Collection Act (CDCA), Md.Com.Law Code Ann., §§ 14–201 through 14–204.

We reject all of the contentions of error made by appellants and cross-appellant and affirm the judgment of the circuit court.

## FACTS

On November 27, 1979, Sharon Hamilton and her mother, Verna Hamilton, purchased a Ford Courier truck from Al Packer Ford in Baltimore City. They executed a Maryland Automobile Retail Installment contract, which Sharon signed as buyer and Verna signed as co-buyer. The truck was purchased for Sharon's use and was titled in her name. The total purchase price was $9095.36 with monthly payments of $165.32. The contract was immediately assigned to FMCC.

In late 1980 or early 1981 Sharon drove to Florida to visit friends and to investigate the possibilities of working or attending school there. She was involved in an accident; the truck was damaged, and she sustained fractures of cervical vertebrae. She returned to Baltimore in March 1981, leaving the truck in Florida. Verna told an agent of FMCC about the accident and informed him that Sharon would be out of work for a while. FMCC granted the Hamiltons an extension of one month on the truck payments.

In the spring of 1981, the Hamiltons fell behind in their payments. Sharon was only working part time and largely on a volunteer basis, while Verna was devoting most of her time to caring for her husband, who had suffered a heart

attack and a stroke in 1980 and was terminally ill, requiring not only the care of Verna, a trained nurse, but other family members, as well, to meet many of his basic needs. Verna and her husband received social security benefits.

FMCC representatives began calling Verna persistently to demand payment, although Verna contends that she repeatedly told them that Sharon was injured and unable to work, that her husband was ill, and that she was financially unable to make the payments. FMCC and Alaimo, however, contend that they did not learn of the condition of Verna's husband until sometime in September of 1981, shortly before the truck was repossessed.

Although various FMCC representatives telephoned Verna, the majority of the calls were made by appellee Bernard Alaimo, who had apparently been assigned the role of principal antagonist. All parties agree that Alaimo was rude and hostile to Verna when he called and that his rudeness and abruptness increased with time. He telephoned at all hours of the day and into the early evening, sometimes several times a week. After a while, he stopped introducing himself when Verna answered the phone and merely began his calls with a demand for payment. One of Verna's neighbors received several calls for Verna, though no messages were left. In the fall of 1981, Alaimo called one evening after 10:00 p.m., awakening Verna from a sound sleep. He shouted at her and, referring to Sharon's earlier assurances that she was seeking employment and would make payment soon, said, "How could you have raised such a liar? I'll be seeing you in court." On another occasion he threatened to ruin Verna's credit.

Verna's daughter Mary and another witness testified that Verna was visibly upset by these calls. Mary took a number of calls herself and once asked FMCC to stop calling because her father was ill and the calls would awaken him and upset Verna. Verna testified that she began to have considerable difficulty sleeping. She claimed that FMCC's persistence was the cause of that condition,

but there was other evidence to the effect that for several years she had suffered urinary incontinence that caused her to get up several times each night. It is clear, nevertheless, that Verna was extremely agitated, as were other members of her family. She felt harassed and abused.

Between March and October 1981, Sharon travelled back and forth to Florida several times, but the truck remained in Florida. On several occasions, representatives of FMCC demanded that Verna tell them exactly where in Florida the truck was located. Verna insisted that she was never sure exactly where her daughter was, because Sharon moved quite frequently and often stayed with friends.

The vehicle was finally repossessed in Florida on November 16, 1981. On November 18, Verna received from FMCC a form entitled "Notice of Repossession and Right to Redeem or Reinstate." This notice was in accordance with Md.Com.Law Code Ann. § 12–625 (1983), which reads as follows:

(a) *Holder to retain repossessed goods.*—For 15 days after the holder gives the notice required by § 12–624(d) of this subtitle, the holder shall retain any repossessed goods in the county where the goods were sold to the buyer or were repossessed.

(b) *Buyer may redeem goods repossessed.*—During the period provided for in subsection (a) of this section, the buyer may:

(1) Redeem and take possession of the goods; and

(2) Resume the performance of the agreement.

(c) *Requirements for redemption.*—To redeem the goods, the buyer shall:

(1) Tender the amount due under the agreement at the time of redemption, without giving effect to any provision which allows acceleration of any installment otherwise payable after that time;

(2) Tender performance of any other promise for the breach of which the goods were repossessed; and

(3) if the discretionary notice provided for in § 12–624(c) of this subtitle was given, pay the actual and reasonable expenses of retaking and storing the goods. Sections 12–624(c) and (d) provide:

(c) *Discretionary notice before repossession.*—(1) At least 10 days before he repossesses any goods, the holder may serve a written notice on the buyer of his intention to repossess the goods.

(2) The notice shall:

(i) State the default and any period at the end of which the goods will be repossessed; and

(ii) Briefly state the rights of the buyer in case the goods are repossessed.

(3) The notice may be delivered to the buyer personally or sent to him at his last known address by registered or certified mail.

(d) *Required notice after repossession.*—Within five days after he repossesses the goods, the holder shall deliver to the buyer personally or send to him at his last known address by registered or certified mail, a written notice which briefly states:

(1) The right of the buyer to redeem the goods, and the amount payable for them;

(2) The rights of the buyer as to a resale, and his liability for a deficiency; and

(3) The exact location where the goods are stored and the address where any payment is to be made or notice delivered.

A clause in the Hamiltons' retail sales agreement expressly provided that the agreement was governed by Maryland law. Accordingly, the November 18 notice informed Verna that she had the right to reinstate the contract within fifteen days by paying a total of $536.88 or that she could redeem the contract by paying the balance due of $4299.40. Verna promptly advised FMCC's branch office in Hunt Valley, Maryland, that she would contact the facility in Florida where the truck was being stored. She also made

an appointment to visit Samuel Gilland, FMCC's account manager, at Hunt Valley to reinstate the contract.

On November 24, 1981, Verna, accompanied by her daughter Mary, went to Hunt Valley to keep her appointment with Mr. Gilland, taking a check for $536.88 to reinstate the contract. Informed that Mr. Gilland was not in, Verna asked to see Mr. Alaimo. At that point, a man in another room, who had apparently heard her request, began shouting that he wanted nothing to do with the Hamiltons and did not want to talk to Verna. In court, Verna was unable to identify that man as Alaimo. In any event, Verna testified that "everybody in the place" looked at her. She said, "I stood there and I was so embarrassed I could have cried, but I figured I would just try to stay on the best side of him. The only thing I had in mind was to get the car."

Verna and Mary were then met by Joseph Murdzak, a supervisor for FMCC. Apparently under the impression that since the car was repossessed in Florida, Florida law applied, Murdzak told Verna that the notice of right to reinstate was a mistake and that she could get the truck back only by paying the full balance of $4299.40. Verna's tender of the $536.88 check was refused. The Hamiltons were unable to pay the full $4299.40, and FMCC subsequently disposed of the truck.

Verna contacted the Commissioner of Consumer Credit and later hired an attorney. She had no further contact with FMCC. In 1982 FMCC, at the suggestion of the Commissioner of Consumer Credit, offered to provide the Hamiltons with a comparable truck and permit them to resume payments. Sharon had since purchased a used vehicle in Florida; and as neither she nor her mother wanted anything more to do with FMCC, they rejected that offer.

In February 1984, Sharon and her mother brought suit against FMCC and Alaimo in the Circuit Court for Baltimore County. In Count One of a six count amended declaration, Sharon sued FMCC for conversion by wrongfully

depriving her of the truck; in Count Two, Sharon and Verna sued FMCC for conversion by wrongfully retaining the truck; in Count Three, Sharon and Verna sued FMCC and Alaimo for conduct that constituted violations of the Maryland Consumer Debt Collection Act and which caused the Hamiltons to suffer emotional distress and mental anguish; in Count Four, Sharon and Verna sued FMCC for breach of contract in failing to return the truck and reinstate the conditional sales agreement; in Count Five, Verna sued FMCC and Alaimo for intentional infliction of emotional distress; and in Count Six, Verna sued FMCC and Alaimo for negligent infliction of emotional distress.

During the trial, the court ruled that only Sharon could recover for conversion of the vehicle since she alone, and not Verna, had a sufficient possessory interest in the property to sustain that cause of action. At the close of the plaintiffs' case, the court granted defendants' motion for judgment on the Sixth Count (negligent infliction of emotional distress) on the ground that Maryland does not recognize such a cause of action. Defendants moved for judgment on all remaining claims at the close of all the evidence; the court reserved ruling on the issue of punitive damages for the conversion claim and issues of liability and damages as to the claim for intentional infliction of emotional distress.

The jury returned a verdict in favor of Sharon on the conversion claim and awarded her $200.60 for property damage, $1.00 for mental pain and suffering, and $1804.00 in punitive damages. The Hamiltons were awarded $200.60 damages on their breach of contract claim. The jury found for both Sharon and Verna on the claim for violation of the CDCA, for which they awarded Sharon $1.00 and Verna $10,000.00. The jury also found for Verna on her claim for intentional infliction of emotional distress, awarding her $1.00 in compensatory damages and $52,500.00 punitive damages against FMCC and $50.00 punitive damages against Alaimo.

Judge Fader subsequently granted defendants' motion for judgment N.O.V. as to the count for intentional infliction of emotional distress on the basis that plaintiffs had failed to present sufficient proof to justify recovery on that cause of action. The court denied all other aspects of defendants' motion.[1]

### I. *Intentional Infliction of Emotional Distress*

This appeal directs our attention once again to the tort of intentional infliction of emotional distress.

The tort of intentional infliction of emotional distress has only recently found recognition in this State, initially by the Court of Appeals in *Harris v. Jones*, 281 Md. 560, 380 A.2d 611, *aff'g Jones v. Harris*, 35 Md.App. 556, 371 A.2d 1104 (1977). Maryland litigants have been quick to test its limits, eager to assert that its principles should be extended to the facts of their particular cases. In *Harris*, the Court of Appeals was asked to recognize a cause of action for an employee with a speech impediment against a supervisor who repeatedly mimicked and taunted him, exacerbating his nervous condition. The cross-appellant in *Continental Casualty Company v. Mirabile*, 52 Md.App. 387, 449 A.2d 1176 (1982), argued that he had established a cause of action by alleging that his supervisor gave him a low evaluation, moved him from desk to desk, hummed at him, made faces at him, yelled and screamed at him to move away from a certain desk, and tapped him on the nose and pushed him. In *Beye v. Bureau of National Affairs*, 59 Md.App. 642, 477 A.2d 1197 (1984), a discharged employee insisted that he was entitled to recover from his supervisors who gave him poor performance ratings, passed over him to promote less qualified individuals, appointed as his supervisor a man whom appellant had attempted to have prosecuted, and

---

1. Under Md.Rule 2–519(d) the court may reserve ruling on a motion for judgment made at the close of all the evidence until after the jury returns its verdict. In such a case the reservation acts as a denial of the motion unless the court enters a judgment N.O.V., which Judge Fader did as to the count for intentional infliction of emotional distress.

deceived him into resigning. In *Dick v. Mercantile-Safe Deposit and Trust Company*, 63 Md.App. 270, 492 A.2d 674 (1985), debtors sought recovery from their creditor because its collection agent shouted angrily at them, threatened to attach their homes and wages, demanded payment in cash only, yelled at them over the telephone, and accused one of them of lying. Most recently, in *Leese v. Baltimore County*, 64 Md.App. 442, 497 A.2d 159 (1985), a disappointed applicant argued he had made out a cause of action when he argued that by virtue of a "sham" interview and because of personal bias and the application of a different standard in judging him than was applied to other applicants he was denied a full-time position in the Department of Aging and relegated to a non-merit, part-time position. In each case it was held that the facts alleged did not support a cause of action for intentional infliction of emotional distress.

 *Harris*, adopting the reasoning of the Supreme Court of Virginia in *Womack v. Eldridge*, 215 Va. 338, 210 S.E.2d 145 (1974), held that there are "four elements which must coalesce to impose liability for intentional infliction of emotional distress...." Those elements are:

(1) The conduct must be intentional or reckless;

(2) The conduct must be extreme and outrageous;

(3) There must be a causal connection between the wrongful conduct and the emotional distress;

(4) The emotional distress must be severe.

281 Md. at 566, 380 A.2d 611. We wish to stress that each of these four requirements must be satisfied completely before a cause of action will lie; meeting even one element less than fully will not suffice. Moreover, the initial determination of whether these elements have been satisfied rests with the trial judge. *Id.* at 569, 380 A.2d 611. If the judge decides that reasonable men would not differ on any one of these elements, he is within his rights to grant a motion to dismiss for failure to state a cause upon which

relief can be granted or to enter a judgment notwithstanding the verdict, as Judge Fader did below.

The Hamiltons contend that the court erred in granting appellees' motion for judgment following the return of the jury's verdict, arguing that there was sufficient evidence to go to the jury. We disagree.

The evidence which the Hamiltons presented consisted of a wide array of objectionable and harassing conduct. There were persistent phone calls, one allegedly late at night. There were repeated calls even after Verna insisted she did not know where the truck was and that she was in no financial condition to pay. There were threats to sue, threats to ruin the Hamiltons' credit, and threats to attach Verna's house and property. There were incorrect assertions that Florida law applied. There was Verna's already strained emotional state due to her husband's illness, Sharon's injuries, and her own difficulty in sleeping, all of which Verna contends appellees knew.

■ Yet even considering all of the evidence in the light most favorable to appellants, which we must do when reviewing the entry of a judgment notwithstanding the verdict, *Vance v. Vance,* 41 Md.App. 130, 134, 396 A.2d 296, *aff'd* in part and *rev'd* in part, 286 Md. 490, 408 A.2d 728 (1979), we conclude that the four elements set out in *Harris* were not met. We focus particularly on the second and fourth elements. The second requirement is that the conduct be extreme and outrageous. Appellees' conduct was unquestionably rude, insensitive, callous, and in poor taste. It was not, however, extreme and outrageous. To satisfy that element, conduct must completely violate human dignity. "[E]xtreme and outrageous conduct exists only if 'the average member of the community must regard the defendant's conduct ... as being a complete denial of the plaintiff's dignity as a person.'" *Dick v. Mercantile-Safe,* 63 Md.App. at 276, 492 A.2d 674, quoting *Alsteen v. Gehl,* 21 Wis.2d 349, 124 N.W.2d 312, 318 (1963). The conduct must

strike to the very core of one's being, threatening to shatter the frame upon which one's emotional fabric is hung.

Appellees' acts were examples of bad taste and poor judgment in connection with the collection of a lawful debt but did not amount to intentional infliction of emotional distress. Creditors have the right to insist on payment of just debts and may threaten legal proceedings. *Dick*, 63 Md. at 276, 492 A.2d 674. Appellees' persistent attempts to extract payment were unquestionably offensive to appellants, but as Professor Calvert Magruder observed, " 'Against a large part of the frictions and irritations and clashing of temperaments incident to participation in community life, a certain toughening of the mental hide is a better protection than the law could ever be.' " *Harris*, 281 Md. at 568, 380 A.2d 611, quoting 49 Harv.L.Rev. 1033, 1035 (1936). Moreover, appellees were not so much unopposed invaders of Verna's psyche as they were combatants against Verna for the collection of payments. It appears that she did not meekly endure the telephone calls but responded in a hostile fashion herself, speaking loudly and hanging up on occasion, generating the "thrust and parry" this court observed in *Dick*. 63 Md.App. at 276, 492 A.2d 674.

Verna also failed to demonstrate that her emotional distress was severe. She produced evidence that she was upset, that she had difficulty sleeping, and that she was embarrassed. To sustain an action for intentional infliction of emotional distress, however, one must suffer an emotional response so acute that no reasonable person could be expected to endure it. *Leese*, 64 Md.App. at 471, 497 A.2d 159; *Harris*, 281 Md. at 570–71, 380 A.2d 611. One must be unable to function, *Vance*, 41 Md.App. at 135, 396 A.2d 296; one must be unable to tend to necessary matters, *Leese*, 64 Md.App. at 472, 497 A.2d 159. Verna simply produced no evidence that she could not function or tend to her everyday affairs. The tale of her frustration and anguish was not one of pain so acute that no reasonable person could be

expected to endure. The absence of such evidence by itself was fatal to her claim. *Compare Moniodis v. Cook,* 64 Md.App. 1, 494 A.2d 212 (1985).

Verna's emotional response to appellees' conduct was no more severe than that of the plaintiff in *Harris,* which the Court found to be an insufficient basis for recovery. Harris was humiliated; his nervous condition aggravated and his speech impediment worsened; he had to see a physician; and he felt " 'like going into a hole and hide [sic].' " 281 Md. at 572, 380 A.2d 611. Although Verna's distress was keen and apparently genuine, it was not disabling. Her ego was bruised and her dignity was bent, but neither was destroyed.

Appellants attempt to distinguish this case from *Harris* and its progeny that involved employer/employee relationships by arguing that an employee must expect to endure more abusive conduct by virtue of his subordinate position. This argument has no persuasive merit. Conduct that would qualify as extreme and outrageous when committed by a creditor should not have to be accepted from an employer. Moreover, *Dick v. Mercantile-Safe, supra,* dealt specifically with the relationship between debtor and creditor. We drew no distinction in that case between an employment relationship and a credit arrangement, and we find none here. In developing the tort of intentional infliction of emotional distress, whatever the relationship between the parties, recovery will be meted out sparingly, its balm reserved for those wounds that are truly severe and incapable of healing themselves.

II. *Negligent Infliction of Emotional Distress*

In Count Six Verna sued appellees for negligent infliction of emotional distress. The court granted appellees' motion for judgment on that count. The Hamiltons now argue that that ruling was in error and insist that Maryland recognizes, at least implicitly, a cause of action for negligent infliction of emotional distress. They are wrong.

Appellants rely on *Vance, supra,* and on the interpretation apparently given *Vance* by the Committee on Civil Pattern Jury Instructions. Arguing that intentional infliction of emotional distress and negligent infliction of emotional distress are two separate and distinct torts, each a viable cause of action in its own right, the Hamiltons point to MPJI 19:7, which reads: "A person who negligently causes severe mental distress to another may be held responsible." They further point to the last sentence of the comment to that instruction which says, "The Court of Special Appeals also held [in *Vance*] there could not be a recovery for negligent infliction of mental distress and for intentional infliction of emotional distress as the two torts are mutually exclusive." Similarly, the comment to MPJI 15:12, Intentional Infliction of Emotional Distress, says that "[intentional infliction of emotional distress] is a new tort insofar as Maryland is concerned and it is to be distinguished from negligent infliction of mental distress (see MPJI 19:7)."

The wording of these two comments is misleading and unfortunate, for we do not believe that the committee intended to suggest that Maryland recognizes a distinct tort for the negligent infliction of mental distress, as these comments clearly do. Although the comment to MPJI 19:7 refers only to the Court of Special Appeals, the Court of Appeals also discussed the issues involved here when it reviewed *Vance,* 286 Md. at 490, 396 A.2d 296. Neither this court nor the Court of Appeals ever suggested that Maryland recognizes or should establish such a tort. That should be apparent from the Court's comments in a footnote to *Vance,* which reads:

> Dr. Vance suggests that the Court of Special Appeals erroneously held that there can be recovery for mental distress without physical injury. This argument is based on the court's statement that "it is time that courts unbind themselves from the outmoded belief that there can be no injury to the mind without overt manifestations of bodily harm." *Vance v. Vance,* 41 Md.App. at 138

[396 A.2d 296]. We do not believe that the quoted statement constitutes an expression of approval by the court of a cause of action for negligently inflicted emotional distress, even absent accompanying physical injury or physical consequence.

286 Md. at 501–02, note 4, 396 A.2d 296. The Court then directed attention to cases such as *Wallace v. Coca-Cola Bottling Plants, Inc.,* 269 A.2d 117 (Me.1970), and *Sinn v. Burd,* 486 Pa. 146, 404 A.2d 672 (1979), where an independent cause of action for the negligent infliction of emotional distress *was* recognized. *Id.* If there is any implication from these comments, it is that while other jurisdictions may allow recovery under the concept of negligent infliction of emotional distress Maryland does not.

Recovery may be had in a tort action for emotional distress arising out of negligent conduct. In such case, the emotional distress is an element of damage, not an independent tort. *Harris* recognized a cause of action for emotional distress independent of any other tort when the conduct causing the distress is sufficiently outrageous and results in an extreme reaction. Appellants would have us expand that concept from conduct intended to create severe distress (or so wanton as to be equivalent to intentional) to merely negligent conduct. We lack the authority and the inclination to extend the concept that far.

We cannot imagine any act opprobrious enough to justify an award of damages solely for the infliction of emotional distress that would not satisfy the definition of reckless conduct encompassed by the concept of intentional infliction of emotional distress. As we pointed out in *Vance,* "Despite the characterization of the tort as the *intentional* infliction of emotional distress, and notwithstanding the use of the adjective *intentional* in its title, the tort need not be *intentional.* The actor is responsible if the injury is inflicted by extreme and outrageous recklessness." 41 Md.App. at 139, 396 A.2d 296 (emphasis in original). Thus, provision for the negligent infliction of emotional distress is already made in the existing tort concept if that conduct amounts to

extreme and outrageous recklessness. We will not diminish that concept by lowering its standards to include any lesser conduct.

### III. *Conversion*

Verna was removed as a plaintiff to the two counts for conversion, and she now contends that the court's ruling was erroneous. We find no error.

Verna argues that since she was the co-buyer of the truck and not merely a guarantor she had constructive possession even though Sharon had sole use of the truck. This, she contends, was sufficient possession to allow her to recover for conversion. It was not.

The law in Maryland concerning conversion says generally that conversion is any distinct act of ownership or dominion exerted by one person over the personal property of another in denial of his right or inconsistent with it. *Interstate Insurance Company v. Logan,* 205 Md. 583, 588–89, 109 A.2d 904 (1954); *Staub v. Staub,* 37 Md.App. 141, 142–43, 376 A.2d 1129 (1977). Maryland law also states specifically that in order to recover for conversion one must either have been in actual possession or have had the right to *immediate possession. Dungan v. Mutual Benefit Life Insurance Company of New Jersey,* 38 Md. 242, 249 (1873); *Lawrence v. Graham,* 29 Md.App. 422, 423–28, 349 A.2d 271 (1975).

The fact that the vehicle was titled in Sharon's name only is not conclusive proof that she was sole owner to the exclusion of Verna. Nor is the fact that Verna signed the installment sales contract as co-buyer conclusive proof that she and her daughter were equal co-owners. The relationship between Sharon and Verna, so far as the truck was concerned, could have been that of joint owners with equal right of possession, or that of purchaser and guarantor, or something in between, depending on the intention of the parties. The Hamiltons themselves defined that relationship in their pleadings, which alleged that Sharon was the owner of the truck and Verna had a vested financial inter-

est in it. Consequently, Verna was not entitled to immediate possession and could not maintain an action for its conversion. Sharon, having sole possession, was alone entitled to recover damages under the count for conversion.

## IV. *Punitive Damages*

FMCC, as cross-appellant, argues that the court erred when it allowed the claim of punitive damages for conversion to go to the jury. We find no error.

The basis of this argument is that there was no legally sufficient evidence that FMCC acted without legal justification or with an evil or rancorous motive designed to injure Sharon. It is true that where the conversion arises out of a contractual relationship punitive damages are recoverable only upon a showing of actual malice. *Henderson v. Maryland National Bank*, 278 Md. 514, 519, 366 A.2d 1 (1976). Actual malice may be inferred from circumstantial evidence, *id.* at 520, 366 A.2d 1. Our inquiry, therefore, is whether there was evidence from which the jury could infer that the cross-appellants acted with actual malice. We find there was evidence adduced from which the jury could infer that FMCC's representatives harbored actual malice toward Verna. Without reciting again the lengthy list of FMCC's acts, we note for example the telephone call late at night in which Alaimo called Sharon a liar, the repeated calls despite requests to stop, and the extent of Alaimo's excessively rude and offensive conduct.

Cross-appellants correctly point out that there was no evidence indicating malice toward Sharon, the party entitled to recover for the conversion. Malice toward her, however, is not essential to recovery of punitive damages. It is enough that a tort was committed and that the tortious conduct was found to have been motivated by malice. Punitive damages are awarded not as compensation to the victim of tortious conduct, but as punishment for the malice that motivated the tort. It may be a rare case in which a tortfeasor will wrong one person out of malice toward

another, but this is such a case. Verna did have some interest in the truck, even if it was not such an interest as would entitle her to immediate possession, as we have noted. It was entirely possible for the jury to find that FMCC's tortious refusal to surrender the truck upon tender of a sufficient sum to reinstate the contract, a conversion for which Sharon could bring suit, resulted from malice toward Verna.

We find no error in the court's submission of this issue to the jury.

## V. *Damages for Pain and Suffering*

 FMCC argues that damages for pain and suffering in connection with property damages are reasonable only upon a showing of fraud or actual malice and that Sharon showed neither. Since we have decided that there was evidence of actual malice, we find no error in the submission of this issue to the jury.

## VI. *Evidence of Financial Worth*

 FMCC alleges error by the court in allowing evidence of its financial worth. It alleges that since punitive damages were improper this evidence prejudiced FMCC, inflamed the jury, and resulted in the award of excessive compensatory damages. We have already decided that punitive damages were not improper. Under such circumstances the jury is permitted to consider the financial worth of a defendant. This has been the rule in Maryland for over one hundred years:

> In all cases of personal wrongs, the general rule is, if the injury has been inflicted maliciously or wantonly, and with circumstances of contumely or indignity, the jury are not restricted to actual or compensatory damages, but may give, in addition thereto, such exemplary or punitive damages as the circumstances of the case will warrant. And, in such cases, the pecuniary circumstances of the defendant are proper to be considered.

*Sloan v. Edwards,* 61 Md. 89, 100–01 (1883). *See also, Heinze v. Murphy,* 180 Md. 423 at 431, 24 A.2d 917; *Gaither v. Blowers,* 11 Md. 536, 552–53 (1857). In light of this well-established rule, the admission of this evidence was proper.

## VII. *Consumer Debt Collection Act*

FMCC and Alaimo argue that the Hamiltons had failed to prove that § 14–202(6) of the CDCA was violated as to either Sharon or Verna. Therefore, they contend, that issue should not have reached the jury. Md.Com.Law Code Ann. § 14–202(6)(1983) provides: "In collecting or attempting to collect an alleged debt a collector may not: * * * (6) Communicate with the debtor or a person related to him with the frequency, at the unusual hours, or in any other manner as reasonably can be expected to abuse or harass the debtor."

In support of their argument, cross-appellants refer to the cases of *Household Finance Corporation v. Bridge,* 252 Md. 531, 250 A.2d 878 (1969), and *Summit Loans, Inc. v. Pecola,* 265 Md. 43, 288 A.2d 114 (1972). Those cases, however, are inapposite; they deal with invasion of privacy, not with the CDCA.

Examining the acts of the cross-appellants complained of by the Hamiltons, we find that those acts come within the language of § 14–202(6). FMCC and Alaimo telephoned Verna Hamilton, one of the debtors; they called her several times, despite protestations that Verna was unable to pay the debt, that she did not know where the truck was located, that her husband was ill and the telephone calls were disturbing; they called despite Verna's requests to stop calling; and they called at least once late at night. From those facts, a violation of the statute could be found. We find no error in the submission of the issue to the jury.

## VIII. *Instructions on Florida Law*

Finally, cross-appellants argue that the court erred in refusing to instruct the jury that under Florida law

FMCC was not required to give the Hamiltons the right to reinstate the installment sales contract, as Maryland law required, but permitted the creditor to insist upon payment of the full balance. The court made no error in ruling as it did because the contract between the parties specifically stated that Maryland law applied. Even under Florida law, that provision in the contract would undoubtedly have been recognized and the law of Maryland applied. The instruction requested by the cross-appellants was properly denied.

JUDGMENT AFFIRMED.

COSTS TO BE PAID ONE-HALF BY APPELLANTS/CROSS-APPELLEES AND ONE-HALF BY APPELLEES/CROSS-APPELLANTS.