758 A.2d 1114

**Jeffrey R. LAPIDES**

v.

**Kirsten TRABBIC.**

**No. 2009, Sept. Term, 1999.**

Court of Special Appeals of Maryland.

Sept. 7, 2000.

Michael B. Hamburg, Towson, for Appellant.

Marla J. Hollandsworth, Phoenix, for Appellee.

Argued before KENNEY, ADKINS and ROBERT L. KARWACKI (Retired, Specially Assigned), JJ.

ADKINS, Judge.

In this case, a father with joint custody of his teenage daughter sought tort damages from his ex-wife's companion. Jeffrey R. Lapides, appellant, sued Kirsten Trabbic, appellee, the domestic partner of his former wife, for interfering with his parental rights and harming his relationship with his daughter. In reviewing the dismissal of appellant's complaint, we must consider whether Maryland recognizes a tort cause of action by a parent against a third party who allegedly persuaded a child to transfer her affection from that parent.

## FACTS AND LEGAL PROCEEDINGS

Appellant and Kathy Gabriel ("Kathy") were separated in April 1994, and subsequently divorced in June 1996. Before they separated, three children were born to the marriage: Jessica, born May 23, 1981; David, born June 23, 1984; and Benjamin, born June 20, 1986. Appellant and Kathy's Separation and Property Settlement Agreement ("Agreement") was incorporated into their divorce decree. Under this Agreement, appellant and Kathy shared joint custody of their three children. The Agreement provided that Jessica was "to choose the location where she resides on any given day." Appellee currently resides with, and is the intimate domestic partner of Kathy.

On March 1, 1999, appellant filed a complaint against appellee alleging: (1) "Intentional interference with parent/child relations;" (2) "Negligence;" (3) "Enticement;" and (4) "Fraud." [1] Appellant alleged, *inter alia,* that appellee's actions "included refusing and denying him the opportunity to speak with Jessica on the telephone; interfering with his

---

1. Appellant also claimed "intentional infliction of emotional distress," but is not challenging the dismissal of that claim on appeal.

telephone calls to Jessica; making deliberate plans to interrupt his time spent with Jessica; instructing Jessica to not speak to him; directing Jessica to disregard his authority; and advising Jessica that he was not the parent responsible for disciplining her." Appellant prayed compensatory damages in the amount of $500,000 and punitive damages in the amount of four million dollars. Appellee filed an answer to the complaint denying the stated allegations and a subsequent motion to dismiss. After a September 27, 1999 hearing, the court dismissed the complaint without leave to amend. Appellant timely noted this appeal.

Additional facts will be added as necessary to our discussion.

## DISCUSSION

Appellant claims that the trial court erred in dismissing his complaint. Specifically, he argues that Maryland courts have not foreclosed a claim by a custodial parent for interference with parent/child relations. In addition, he contends that appellee owed him a duty "based on the responsibility each person has to exercise due care to avoid unreasonable risk of harm to others," and that she breached this duty by engaging in acts that contributed to the "estrangement [of] his relationship with his daughter." Appellant's final claim is that he was fraudulently induced to "back off" his claim for sole custody of his children due to his reliance on appellee's answers regarding the nature of her relationship with Kathy during a deposition taken in appellant's divorce case.

## I.

### Standard Of Review

In considering a motion to dismiss for failure to state a cause of action, a trial court must assume the truth of all well-pleaded relevant and material facts in the complaint, as well as all inferences that reasonably can be drawn therefrom. *See Odyniec v. Schneider,* 322 Md. 520, 525, 588 A.2d 786 (1991). To this end, the facts comprising the cause of action

must be pleaded with sufficient specificity. *See Continental Masonry Co. v. Verdel Constr. Co.,* 279 Md. 476, 481, 369 A.2d 566 (1977). Further, although the words of a pleading will be given reasonable construction, when a pleading is doubtful and ambiguous, it will be construed most strongly against the pleader in determining its sufficiency. *See Hixon v. Buchberger,* 306 Md. 72, 75, 507 A.2d 607 (1986). Dismissal is proper only if the alleged facts and permissible inferences, so viewed, would, if proven, nonetheless fail to afford relief to the plaintiff. *See Morris v. Osmose Wood Preserving,* 340 Md. 519, 531, 667 A.2d 624 (1995). On appeal from the granting of a motion to dismiss, this Court must determine whether the trial court was legally correct, examining solely the sufficiency of the pleading. *See Bobo v. State,* 346 Md. 706, 709, 697 A.2d 1371 (1997).

## II.

### Intentional Interference With Parent/Child Relations And Enticement

Appellant contends that the trial court erred in dismissing his claims of intentional interference with parent/child relations and enticement. He posits that his allegations that appellee committed intentional acts aimed at destroying his relationship with Jessica were the equivalent of stating a claim that appellee induced Jessica to remain apart from him. Appellant asserts that "Maryland recognizes such torts" and bases his argument on *Hixon v. Buchberger, supra,* and the *Restatement (Second) of Torts* ("Restatement") (1977) § 700. We are not persuaded that appellant has stated a claim recognizable under either the Restatement or prior Maryland decisions. We explain.

In *Hixon,* the fiancé of the custodial mother made "belligerent and hostile statements" to the father, Hixon. *See Hixon,* 306 Md. at 73, 507 A.2d 607. After the case was dismissed in the trial court for failure to state a claim, the Court of Appeals was called upon to "recognize as part of Maryland common law a cause of action for money damages based on intentional

interference by a nonparental, noncustodial third party with the child visitation rights of a noncustodial parent." *Id.* This the Court declined to do.

Hixon urged the Court to adopt a theory of law stating that "a proper recognition of the interests of a parent who is awarded visitation rights includes recognition of a cause of action for damages for intentional interference with visitation rights." *Id.* at 79, 507 A.2d 607. In its discussion, the *Hixon* Court reviewed "cases, decided in the decades on both sides of the turn of the last century, [dealing with] that tortious interference with domestic relations known as enticement or abduction of the child." *Id.* at 77, 507 A.2d 607. It found that these older Maryland cases "state the prerequisites of that tort to be that the parent have the right to custody and that actual service have been rendered by the child to the parent which the parent lost due to the abduction, enticement, or harboring by the defendant." *Id.*

> The *Hixon* Court then reviewed the Restatement view that '[o]ne who, with knowledge that the parent does not consent, abducts or otherwise compels or induces a minor child to leave a parent legally entitled to its custody or not to return to the parent after it has been [sic] left him, is subject to liability to the parent.'

*Id.* at 78, 507 A.2d 607 (quoting Restatement § 700). It recognized that under the more modern view stated in the Restatement, " 'loss of service or impairment of ability to perform service is not a necessary element of a cause of action.' " *Id.* at 77–8, 507 A.2d 607 (quoting Restatement, § 700 cmt. *d* ).

The *Hixon* Court did not expressly accept or reject the Restatement view of the tort, but concluded that "[o]f principal significance for present purposes is that the § 700 tort lies only at the instance of a custodial parent." *Id.* at 78, 507 A.2d 607. It expressly declined, however, to rule on Hixon's contention that "Maryland law should not limit monetary recoveries in cases of intentional interference with parent/child relations to interferences with custody" and that "a proper

recognition of the interests of a parent who is awarded visitation rights includes recognition of a cause of action for damages for intentional interference with visitation rights." *Id.* at 79, 507 A.2d 607.

After discussing cases from other jurisdictions, the Court rested its holding upon the minor nature of the interference alleged to have occurred:

It is apparent from the foregoing review that the interference alleged here falls short, by a considerable distance, of the more substantial interferences presented in many of the cases relied upon by Hixon. The belligerent words described by Hixon are a relatively minor interference. Indeed, the nature of the interference alleged here is so minor that it is doubtful whether most courts would recognize it as mounting up to a tortious interference with custody rights, remediable by damages, were the same verbal exchange to have taken place when a custodial parent might be picking up a child at the end of a visit with a noncustodial parent. Consequently we need not decide in this case whether, or, if so, under what circumstances a damage action might lie for interference with visitation rights. We hold simply that a parent or that parent's ally who, without committing any tort presently recognized in Maryland, speaks hostilely to the other parent about that parent's exercise of custody or visitation rights does not thereby become liable in damages.

*Id.* at 83, 507 A.2d 607. The Court further stated that it did not accept the proposition "that, because they deter (or might deter) illegal conduct, damage suits are a desirable remedy . . . ." *Id.* The Court concluded that, in light of the other equitable remedies available to an aggrieved parent, "[w]e are not persuaded that an additional weapon is needed in the arsenals of divorced or separated parents to deal with harsh words passing between them over the exercise of custody or visitation rights. There need not be a damage suit to remedy every annoyance which one encounters in life." *Id.* at 84, 507 A.2d 607.

In the present case, appellant, like Hixon, relies on Restatement § 700. Not cited by appellant, but critical to under-

standing the Restatement view, is the preceding section 699 of the Restatement, entitled "Alienation of Affections of Minor or Adult Child." Section 699 states:

> One who, without more, alienates from its parent the affections of a child, whether a minor or of full age, is not liable to the child's parent.

Viewing sections 699 and 700 together, we see that under the Restatement view, an actionable tort must be predicated on proof of acts other than the mere persuasion of a child to transfer its affection from its parent. At best, the allegations of the present complaint only allege this type of persuasion. We explain.

Appellant contends that the present case is much more egregious than *Hixon* in that he "has alleged much more than a single incident of belligerent remarks; rather he has described a pattern of continuing intentional disruptive conduct." On appeal, he relies on the following conduct to support his claim: "refusing and denying him the opportunity to speak with Jessica on the telephone; interfering with his telephone calls to Jessica; making deliberate plans to interrupt his time spent with Jessica; instructing Jessica to not speak to him; directing Jessica to disregard his authority; and advising Jessica that he was not the parent responsible for disciplining her." Notably, appellant does not assert in his brief that he relies on any action by appellee to induce or encourage Jessica to live with her mother, rather than appellant.

The actions alleged by appellant could have serious repercussions, and would be considered by a court sitting in equity evaluating a contempt action for violation of a custody or visitation order, a petition for modification of custody or visitation under Md.Code (1984, 1999 Repl.Vol.) § 9-105 of the Family Law Article ("FL"), or similar actions. They are not the type of actions, however, that transform a family law issue into a tort claim under either existing Maryland law or precedent in other states.

Appellant has not cited any out-of-state authority to support his position, and relies only on Restatement § 700, which we

have previously discussed. We have looked extensively at cases involving claims for tortious interference with parent/child relations in other jurisdictions, and find no authority recognizing a tort based on facts similar to this case.

The cases that recognize the tort have generally involved instances where the custodial parent was deprived of the physical presence of the child for a continuous period because of the defendant's actions in abducting, enticing, or assisting in the abduction or enticing of a child from that parent's custody. *See Anonymous v. Anonymous,* 672 So.2d 787, 789–90 (Ala. 1995) (holding that tort may be recognized in case involving abduction of child by male juvenile and his parents); *Surina v. Lucey,* 168 Cal.App.3d 539, 214 Cal.Rptr. 509, 511–13 (1985) (abduction by uncle of child); *D & D Fuller CATV Constr., Inc. v. Pace,* 780 P.2d 520, 523–24 (Colo.1989) (recognizing the tort based on a criminal statute making it a crime to take child from his or her lawful custodian and to deprive the lawful custodian of custody of a child*); Connecticut v. Vakilzaden,* 251 Conn. 656, 742 A.2d 767, 770–72 (1999) (holding that helping nephew to flee country with nephew's daughter constitutes interference with rights of mother, who was custodial parent); *Plante v. Engel,* 124 N.H. 213, 469 A.2d 1299, 1301–02 (1983) (non-custodial mother, in violation of custody order, moved child to another state); *Casivant v. Greene County,* 234 A.D.2d 818, 819–20, 652 N.Y.S.2d 115 (N.Y.A.D.1996), *aff'd* 90 N.Y.2d 969, 665 N.Y.S.2d 952, 688 N.E.2d 1034 (1997) (holding that tort requires abduction); *Brown v. Denny,* 72 Ohio App.3d 417, 594 N.E.2d 1008, 1011 (1991) (holding that grandparents tortiously interfered with parental relationship by taking, keeping, or harboring parent's children); *Kessel v. Leavitt,* 204 W.Va. 95, 511 S.E.2d 720, 758–59, cert. denied, 525 U.S. 1142, 119 S.Ct. 1035, 143 L.Ed.2d 43 (1998) (third parties assisted in removing child to Canada for adoption against father's rights). *See also* Prosser, *The Law of Torts,* § *124* (4 th ed.1971).

At least one case has explicitly articulated the child's continuing physical absence from the custodial parent to be a

prerequisite for statement of a claim for tortious interference with parent/child relations. *See Murphy v. I.S.K. Con. of New England, Inc.,* 409 Mass. 842, 571 N.E.2d 340, 351, *cert. denied,* 502 U.S. 865, 112 S.Ct. 191, 116 L.Ed.2d 152 (1991). In *Murphy,* the Massachusetts court summarized the common law basis for the tort:

'The common law has traditionally recognized a parent's interest in freedom from tortious conduct harming his relationship with his child,' and the parent 'may be compensated therefor when there is interference with the normal parent-child relationship.' The tortious conduct referred to [in previous Massachusetts cases] includes the abduction, enticement, and harboring and secreting of minor children from their parents, or in other words, the intentional interference with parental interests or rights. The elements of these causes of action are well established. Abduction is the physical taking of a minor child from the parent having legal custody. An action for enticement will lie where one, through an 'active and wrongful effort' and knowing that the parent does not consent, induces a child to leave the parent's home. One 'harbors' a minor child by inducing or encouraging a child, who is away from the parent without the parent's consent, to remain away from the parent.... Implicit in each action is the requirement that the child be physically absent from the home for a continuous period of time. To allow recovery for interference with parental interests without physical absence of the minor child from the home would be to allow an action for alienation of affections, for which recovery cannot be had.

*Id.* at 351, 571 N.E.2d 340 (citations omitted).

Relying, in part, on *Murphy,* the Supreme Court of Florida, in a recent decision of first impression, recognized the cause of action for interference with parent/child relations when a grandparent and others intentionally abducted the child. *See Stone v. Wall,* 734 So.2d 1038 (Fla.1999).[2] In its opinion, the

---

**2.** In addition to reliance on *Murphy's* requirement of physical absence from the home, the Florida court quoted a West Virginia case, which explained the essential nature of the tort as intimating that:

Florida court distinguished the latter tort from the historical tort of alienation of affections, which had been abolished by statute.[3] *See id.* at 1046. It also reasoned that "[i]t is obviously in the best interests of children to be returned promptly to their legal custodians." *Id.* Quoting the Iowa Supreme Court, it said:

> A tort suit will be more likely to effect a speedy return of the child; it will result in better cooperation by potential third-party defendants seeking to avoid the suit; ... and increased knowledge of a child's whereabouts will result through the broad scope of civil-case discovery.

*Id.* (quoting *Wood v. Wood,* 338 N.W.2d 123, 127 (Iowa 1983)).

Finally, the Florida Supreme Court justified the risk that children may be injured by such litigation concerning them, by balancing that risk against the greater injury that may result when children are removed from their legal caretakers:

> While the courts must be constantly vigilant to guard against the misuse of the legal process, those who would bypass the legal system by taking children from those who have a superior right to legal custody cause a far greater affront to our system of justice. Such conduct has the

---

'the complaining parent has been deprived of his/her parental or custodial rights; in other words, but for the tortious interference, the complaining parent would be able to exercise some measure of control over his/her child's care, rearing, safety, well-being, etc. By contrast, 'alienation of affections' connotes only that the parent is not able to enjoy the company of his/her child....'
*Id.* at 1045 (quoting *Kessel,* 511 S.E.2d at 761 n. 44).

3. In Maryland, the tort known as "alienation of affections" may never have covered the parent/child relationship. *See Miller v. Ratner,* 114 Md.App. 18, 37, 688 A.2d 976, *cert. denied,* 345 Md. 458, 693 A.2d 355 (1997) (characterizing the tort as "[arising] when a person induced a married woman to leave her husband or otherwise interfered with the marital relationship, even though no act of adultery was committed") (quoting *Kline v. Ansell,* 287 Md. 585, 590, 414 A.2d 929 (1980)). Even if it did, the tort was abolished in Maryland in 1945. *See* 1945 Md. Laws, Chap. 1010, House Bill 341; FL § 3–102. For extensive review of legislative history of the statute abolishing this cause of action, see *Miller,* 114 Md.App. at 27–38, 688 A.2d 976.

potential for causing far greater harm to the children than litigation.

*Id.* at 1046.

Were Maryland to recognize an action for tortious interference with parent/child relations, we think that physical removal of the child from the custodial parent would be essential to such action. The great potential for injury resulting from such physical removal may warrant the imposition of tort damages. Any lesser interference with a parent's custodial rights would be outweighed in the balancing between the merits of the tort action as a deterrent to interference, and the great potential for injury to children that will result from additional litigation involving the children. The potential for such injury was best articulated by the Supreme Court of Minnesota in *Larson v. Dunn,* 460 N.W.2d 39 (Minn.1990):

> Children of divorce generally love their parents and want a loving and helpful relationship with both parents once the marriage is dissolved. With this tort, a child may be forced to testify against his or her own mother or father. One can only imagine the torment of a young child forced to testify in writing or verbally against a parent he or she loves....
> Evidence is piling up that children can be devastated by divorce, and their continuing development can be detrimentally affected by subsequent events.... For the good of our children, the law should seek to promote such harmony as is possible in families fractured by the dissolution process. At a minimum, the law should not provide a means of escalating intra family warfare.

*Id.* at 45-6 (citations omitted).[4]

Our discussion to this point has been based on the assumption that appellee's alleged actions did not cause the removal of Jessica's physical presence from appellant's care and con-

---

**4.** Although the Minnesota Supreme Court concluded that the tort would not lie even when the child was physically abducted, we do not have to resolve that issue in this case. Minnesota's view, that the tort will not lie even for physical abduction, is a minority view. *See Stone,* 734 So.2d at 1043-46, n. 6, n. 9.

trol to her mother's care and control. As previously indicated, we interpret appellant's arguments in this appeal to rely solely on allegations made in the complaint that appellee undermined his relationship with Jessica, interfered with phone calls, and interrupted his visits with her. This is what appellant has cited as the only basis for his contentions on appeal. We would not reach a different result, however, even if we were to also consider other allegations in the complaint that "through her actions, [appellee] induced and compelled Jessica Lapides not to reside with" appellant. We explain.

The Agreement signed by the parties and incorporated into the divorce decree provided that Jessica was to "choose the location where she resides on any given day." The allegations of the complaint do not inform us how Jessica chose to divide her time between appellant and Kathy. Thus, the facts, as alleged, are insufficient to tell us whether appellee's alleged interference resulted in a total deprivation of appellant's time with Jessica, a decrease in her time, or simply a decrease in the closeness of appellant's relationship with Jessica. We wish to make clear in our decision, however, that even if Jessica chose to spend all of her time with her mother and appellee, and her decision were caused by appellee's actions alleged in the complaint, appellant did not state a cause of action in tort for enticement or intentional interference with custodial rights. We reach this conclusion based on the nature of the parties' Agreement respecting custody.

The custody arrangement between appellant and Kathy contemplated that Jessica, who was age fifteen at the time the Agreement was made, would choose how she would spend her time between each parent. Thus, each parent agreed that it was acceptable for her to be living with the other parent, if that is what Jessica chose. In giving approval to this arrangement, each parent gave up the right to physical custody of Jessica vis a vis the other parent. In other words, neither parent had rights superior to the other parent with respect to the location of Jessica's residence.

If Jessica chose to live with her mother, such residence was simply one of the acceptable alternatives contemplated by the Agreement. As such, the consequences of Jessica's decision cannot be viewed as comparable to the consequences of a party's action in abducting or enticing a child to live with someone *other* than the custodial parent. As explained in *Wall, supra,* the wrongful removal of a child from the child's custodian causes "a far greater affront to our system of justice" than the more common efforts to undermine another parent's relationship with the child. *Wall,* 734 So.2d at 1046.

██ In the absence of an allegation of enticement or abduction from the home of the custodial parent, we do not consider that the efforts to undermine the parental authority that are alleged in this case are sufficiently compelling to justify the recognition of a tort cause of action, with its attendant adverse consequences upon children. Efforts to undermine parental authority, whether made by a non-custodial parent, a co-custodial parent, or a third party allied with one parent, are common sources of litigation in our family courts. Such actions foster problems for children, parents, and court systems. They are adequately addressed through remedies such as contempt, modification of custody, and attorney fee awards, which are the traditional province of a court applying family law. The adverse consequences of adding a tort action for damages to the mix of parents' remedies in such situations outweigh any beneficial effect.

## III.

### Negligence

We turn to appellant's next contention: that the trial court erred in granting appellee's motion to dismiss with respect to the claim of negligence. In his complaint, appellant alleged that "but for [appellee's] negligence, [he] would have enjoyed a more positive and closer relationship with Jessica." Appellant argues that he suffered emotional damages because of appellee's negligent behavior. Appellant further contends that appellee breached a duty "based on responsibility each person

has to exercise due care to avoid unreasonable risk of harm to others."[5] Appellant contends a duty was owed by appellee because: "(1) there existed a very close relationship between the [a]ppellant and [a]ppellee; and (2) the damages complained of were foreseeable." Appellee, appellant argues, "owed [him] a duty by way of her close relationship with his children and that her breach of that duty caused him damages."

■ We need not reach the duty issue raised by appellant, because he has not alleged an actionable tort. Unintended emotional distress negligently inflicted by conduct not itself tortious is not a recognized tort. *See Hamilton v. Ford Motor Credit Co.*, 66 Md.App. 46, 63, 502 A.2d 1057, *cert. denied*, 306 Md. 118, 507 A.2d 631 (1986). In *Hamilton*, this Court explained "Recovery may be had in a tort action for emotional distress arising out of negligent conduct. In such case, the emotional distress is an element of damage, not an independent tort." *Id.*

Because Maryland does not recognize the separate and distinct tort of negligent infliction of emotional distress, the lower court properly granted appellee's motion to dismiss appellant's claim for negligence.

## IV.

### Fraud

Appellant lastly claims that the trial court erred in dismissing his claim for fraud. In his complaint, appellant alleged that appellee made misrepresentations about the nature of her relationship with appellant's ex-wife, Kathy, in a deposition taken on May 25, 1994 in the divorce case between appellant and Kathy. Complaining that appellee misrepresented "the true nature of her relationship with [Kathy]—that is one of a sexual lesbian relationship," he asserted that appellee's alleged

---

5. Appellant is quoting "Rosalyn B. Bell, MD. Civil Jury Instructions and Commentary, § 29.01 and comment (1993)."

misrepresentation induced him to agree to joint custody of the minor children nearly two years later, in June 1996.

On appeal, appellant contends that the circuit court erred in "rul[ing] as a matter of law that a party has no right to rely upon statements made in a deposition under oath...." But appellant reads the court's ruling too narrowly.[6] In doing so, he fails to address the question ultimately decided by the court—do the allegations of the complaint state a cause of action for fraud? We agree with the circuit court, and hold that they do not.

 In order to allege fraud on the part of appellee, appellant must allege each of the following elements:

(1) a material representation of a party was false, (2) falsity was known to that party or the misrepresentation was made with such reckless indifference to the truth as to impute knowledge to him, (3) the misrepresentation was made with the purpose to defraud (scienter), (4) the person justifiably relied on the misrepresentation, and (5) the person suffered damage directly resulting from the misrepresentation.

*Colandrea v. Colandrea,* 42 Md.App. 421, 428, 401 A.2d 480 (1979) (citations omitted).

Appellant has failed to state a fraud claim because he has failed to allege that he was damaged by the alleged misrepresentation. Appellee correctly points out that appellant failed to allege that the custody arrangement to which he agreed proximately caused damage to his relationship with Jessica. Appellant seems to assume that his alleged reliance in entering into the Agreement consenting to joint custody, and affording Jessica her choice of residence, was sufficient to show damage from the alleged fraud. This assumption is not justified.

---

6. In reviewing dismissal of a complaint, we may affirm if the allegations of the complaint fail to set forth a legally sufficient cause of action. *See Shah v. HealthPlus, Inc.,* 116 Md.App. 327, 333, 696 A.2d 473, *cert. denied,* 347 Md. 682, 702 A.2d 291 (1997).

■ Appellant has failed to identify the nature of the harm with sufficient specificity. If appellant assumes, and asks a court to assume, that Jessica's mere residence in the household of appellee and Kathy is sufficient to allege damage to the father-daughter relationship, he is mistaken. Appellant fails to allege that any intimate sexual relation or living arrangement between appellee and Kathy proved harmful to either Jessica or to his relationship with Jessica. As the Court of Appeals explained in *Boswell v. Boswell*, 352 Md. 204, 721 A.2d 662 (1998), the requirement of proof of an adverse impact from a parent's non-marital relationship is an entrenched aspect of Maryland's custody jurisprudence. *See id.* at 236, 721 A.2d 662. The *Boswell* Court held that the existence of a non-marital sexual relationship, whether heterosexual or homosexual, between a parent and a third party, is not relevant to a determination of that parent's rights to visitation or custody, absent a showing of actual harm to the child from that relationship. *Id.* at 235–37, 721 A.2d 662. The Court of Appeals also made clear that the same rule would be applied when a court was making custody determinations. *Id.* Absent any allegation that appellee's relationship with Kathy injured Jessica, or the other children of appellant and Kathy, or that the relationship itself harmed appellant's relationship with Jessica, appellant has not alleged any damage arising from appellee's alleged misrepresentation as to the nature of that relationship.

Moreover, the defect in appellant's complaint is not a correctable matter of semantics or pleading. Appellant would fare no better if he had alleged more specifically that as a result of his refusal to enter into the Agreement, a different custody arrangement would have reduced appellee's "access" to Jessica, and therefore, diminished her influence on Jessica, her opportunity to undermine the father-daughter relationship, and the consequent emotional distress allegedly suffered by appellant. Even if such allegations had been made and were taken as true for purposes of ruling on the motion to dismiss, nevertheless, we would conclude that appellant has not sufficiently alleged any compensable damage.

It is clear from a reading of the fraud count, and of the entire complaint as a whole,[7] that appellant seeks monetary compensation for purely noneconomic damages—i.e., for his emotional distress over the breakdown of his relationship with his teenage daughter. Appellant has not cited any Maryland precedent supporting his contention that a fraud cause of action may be premised solely upon allegations of emotional distress or other noneconomic damage. Nor have we found any.[8]

Without deciding whether noneconomic "emotional distress" damages might be available in other types of cases

---

7. The complaint filed by appellant alleged only the following nonpecuniary damages:
- That appellee "succeeded in alienating Jessica" from him (intentional interference with parent/child relations count);
- That "[b]ut for [appellee's] negligence, [appellant] could have enjoyed a more positive and closer relationship with Jessica" (negligence count);
- That appellant "suffered damages as a result of [appellee's] actions" in "induc[ing] and compell[ing] Jessica Lapides not to maintain a close bond with [appellant]" (enticement count);
- That "[appellant] has suffered severe *emotional distress as a result* of [appellee's] behavior," and that "there exists a causal connection between [appellant's] severe emotional distress and [appellee's] intentional and outrageous conduct" (intentional infliction of emotional distress count); and
- That "as a result of the misrepresentations, [appellant] suffered injury in that he eventually agreed to share in the custody of his children with his former wife—a situation that he would not have otherwise agreed to had he been aware of the true relationship between [appellee] and Kathy Gabriel" (fraud count).

8. In *B.N. v. K.K.*, 312 Md. 135, 538 A.2d 1175 (1988), the Court of Appeals recognized that fraud "is usually applied in a business setting, or to one in which some pecuniary loss is claimed." *Id.* at 149, 538 A.2d 1175. Nevertheless, the Court concluded that "a business setting and pecuniary loss are not necessarily required. . . . The *Restatement* sets forth a number of situations in which there may be liability for physical harm (and consequent economic loss) caused by a fraudulent misrepresentation." *Id.* at 149–50, 538 A.2d 1175 (citing *Restatement (Second) of Torts* § 525, 554 (1977)). In that case, the Court concluded that the plaintiff had satisfied the "damage" element of fraud by alleging that the defendant had caused her physical harm and consequent pecuniary loss by fraudulently concealing the herpes infection that he transmitted to her during sexual intercourse. *See id.* at 153, 538 A.2d 1175.

alleging fraud,[9] we conclude that such damages are not available in the context of child custody cases. The same serious concerns about involving a child in custody litigation that we have already decided preclude appellant's claims for interference with parent/child relations, enticement, and negligence also would preclude appellant's claim for fraudulent inducement of the Agreement concerning custody. In other words, we do not recognize a parent's claim for noneconomic damages in a case against a third party alleging fraudulent inducement of a child custody agreement.[10]

---

**9.** Section 549 of the *Restatement* requires some showing of pecuniary loss as an essential element of a fraudulent misrepresentation cause of action. *See Restatement (Second) of Torts*, § 549. The right to recover noneconomic damages in a fraud action for mental or emotional distress, without a showing of physical harm or pecuniary loss, has been the subject of much debate. The majority rule appears to be that some pecuniary loss is an essential element of a fraud claim. *See generally* Dan B. Dobbs, *Law of Remedies* § 9.2(4), at 559–60 (2d ed.1993) ("the usual rule is that ... [fraud] damages are limited to such pecuniary loss, with no recovery for emotional distress"); Steven J. Gaynor, "Fraud Actions: Right to Recover for Mental or Emotional Distress," 11 A.L.R.5th 88 (collecting and analyzing cases considering whether fraud damages are limited to actual pecuniary loss); Andrew L. Merritt, "Damages for Emotional Distress in Fraud Litigation: Dignitary Torts in a Commercial Society," 42 Vand. L.Rev. 1, 2 (1989) (although "[n]o judicial consensus exists on the propriety of awarding damages for emotional distress in fraud cases, .... [m]any jurisdictions limit damages for fraud to pecuniary injuries; this .view has had the most influence on legal commentators and treatise writers"); *Nelson v. Progressive Corp.*, 976 P.2d 859, 867–68 (Alaska 1999) (examining "wide divergence of authority" among the courts on this issue, and restricting recovery for purely noneconomic damages to "severe emotional distress" sufficient to meet the severity requirements for an intentional infliction of emotional distress claim).

**10.** Because appellant did not allege any economic damages, we are not faced with, and do not decide, whether a cause of action lies against a third party for economic damages arising from the fraudulent inducement of an agreement regarding child custody and/or child support. We do recognize that the determination of whether such claims are viable would require consideration of the same "danger to the child" concerns that we have expressed here. Moreover, there may be other relevant policy and practice concerns. Among such concerns might be (1) the difficulty of reaching a factual determination that "but for" the third party's fraud, the custody arrangement would have been different; and (2) the difficulty of measuring how much more the fraudulently

In addition to the policy reasons we have previously discussed, there are practical reasons for such a restriction. As we have already noted, there are alternative—and we believe better—remedies to redress damage to the parent/child relationship in these circumstances. When a divorced or separated parent is distressed over a deteriorating relationship with his children, and believes that the deterioration is caused by a custody arrangement to which he agreed, the parent can petition the court to modify the custody arrangement. *See* FL § 9–105. The decision regarding whether and to what extent the custody arrangement should be modified would be made by a court with jurisdiction over custody issues pertaining to the children in question, in proceedings specially designed to minimize the harmful effects of that litigation on those children. The focus of such a proceeding would be to determine and remedy any harm that the custody arrangement may have caused the children or the parent/child relationship.

In contrast, the focus of appellant's claim against appellee is not remedial, but rather to "prove" the damage and place a dollar value upon it. We seriously doubt the wisdom and value of entertaining a cause of action that, instead of promoting constructive changes in the parent/child relationship, encourages an aggrieved parent to spend time, talent, and treasure to pursue money damages against a third party via a collateral attack on a child custody agreement.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY APPELLANT.**

induced custody arrangement cost the claimant than the most likely alternative custody arrangement would have cost.